No. 52,968

SUPER CHIEF CREDIT UNION, *Appellee,* v. ROBERT G. GILCHRIST and
SANDRA LEE PARKS, *Appellants.*

(653 P.2d 117)

Opinion filed October 22, 1982.

*Lowell C. Paul,* of Legal Aid Society of Topeka, Inc., argued the cause and
*James E. Sanders,* of Legal Aid Society of Topeka, Inc., and *Leonard M. Robinson,* of Topeka, were with him on the briefs for the appellants.

*Deanne Watts Hay,* of Sloan, Listrom, Eisenbarth, Sloan and Glassman, of
Topeka, argued the cause and *Thomas A. Valentine,* of the same firm, was with her
on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: This is an action by a lender seeking a deficiency
judgment against a borrower and his guarantor following a voluntary surrender and liquidation of the security. The borrower
counterclaimed for violations of the Truth in Lending Act
(TILA). The trial court rendered judgment for the lender. The
pertinent facts are these: On or about April 11, 1977, Robert
Gilchrist executed an "open end promise to pay" to the Super
Chief Credit Union. The agreement provided for value received
and to be received from time to time; Gilchrist agreed to repay to
Super Chief all money and property advanced to him. The rate of

interest and the minimum periodic payments were to be set out prior to the consummation of each transaction. Pursuant to the agreement Gilchrist pledged all shares which he might have in the credit union as security for all money loaned him by Super Chief.

Approximately two days later, on April 13, 1977, Super Chief advanced to Gilchrist the sum of $1536.68 under the open end promise to pay. Prior to the consummation of this transaction, Super Chief provided Gilchrist with a document entitled "Credit Union Application - Notice of Terms - Disclosure Statement" dated April 13, 1977. This document informed Gilchrist the amount owed, the date, rate of interest and that the security agreement previously given Super Chief would remain in effect on the described property until all obligations to the credit union were paid in full or until cancelled by the credit union.

In conjunction with the advance of April 13 and by an agreement of the same date, Gilchrist gave to Super Chief a security interest in the 1972 Buick he purchased with the funds. This security interest was released June 9, 1978.

On or about May 9, 1978, Super Chief advanced Gilchrist an additional $2380.83 under the open end promise to pay. This amount, which was used to purchase a 1973 Pontiac Grand Prix, was added to an existing account balance of $546.51. Prior to the consummation of this transaction Super Chief gave Gilchrist another "Credit Union Application - Notice of Terms - Disclosure Statement," dated May 9, 1978, which made the same disclosures as the April 13, 1977, document. In conjunction with this advance Gilchrist signed an agreement giving Super Chief a security interest in the 1973 Pontiac.

As further security for the May 9 advance Super Chief obtained a limited guarantee agreement from Sandra Parks for $2927.34, the entire amount owing from Gilchrist to Super Chief.

Gilchrist had difficulty making the minimum monthly payments on the May 9 advance. On January 17, 1979, he voluntarily surrendered the 1973 Pontiac to Super Chief. Super Chief sold the car and applied the proceeds to Gilchrist's unpaid balance. A deficiency of $1776.30 remained. On July 12, 1979, Super Chief filed an action against Gilchrist and Parks seeking judgment in that amount. Both defendants answered, denying liability and counterclaiming against Super Chief for alleged violations of the

TILA, 15 U.S.C. 1601 *et seq.* The district court ruled in favor of Super Chief, denying the appellants' claims in toto.

Gilchrist and Parks appealed. In the unpublished opinion the Court of Appeals reversed holding Super Chief had not complied with the disclosure requirements of the TILA. The Court of Appeals also remanded the case, ordering the trial court to enter judgment in favor of the appellants for twice the original finance charge (15 U.S.C. § 1640[a]), and to award appellants costs and reasonable attorney fees.

This court granted Super Chief's petition for review.

Because the issues in this case involve the interpretation of the Federal Truth in Lending Act (TILA) (15 U.S.C. 1601 *et seq.*) it would be best to examine the legislative history and purpose behind the Act. Unless otherwise noted all references are to the Act as it stood at the time of the transactions in question. The Truth in Lending Simplification and Reform Act, signed into law by President Carter on March 31, 1980, is not applicable to this case.

Acquiring consumer goods and services on credit has obviously become an integral way of life for many people in the United States. Prior to the enactment of the TILA, however, the consumer was unable to make simple and direct cost comparisons among the many alternative sources of credit. The availability of credit loans, bank financing, small loan companies and revolving credit often trapped the consumer in a veritable jungle of figures. The divergent, and sometimes fraudulent, practices by which credit customers were informed as to the terms of the credit extended to them made it difficult for customers to shop around and compare the various credit terms available. As a result consumers were prevented from obtaining the best possible credit terms. They often assumed liability they could not meet. See *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 36 L.Ed.2d 318, 93 S.Ct. 1652 (1973).

In an attempt to remedy this situation Senator Paul Douglas introduced the first truth in lending bill January 7, 1960. Although his bill died in committee, Senator Douglas had started the ball rolling. In each subsequent session of Congress efforts were made to enact truth in lending legislation. Finally, in May of 1968, President Johnson signed the TILA into law. The first section of that act states:

"The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumer. It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).

Since the adoption of the TILA courts have added their own interpretations of congressional purpose. One court has stated the Act reflects a transition in Congressional policy from the philosophy of let-the-buyer-beware to one of let-the-seller-disclose. *Allen v. Beneficial Finance Co.,* 393 F. Supp. 1382, (N.D. Ind.), *aff'd* 531 F.2d 797, *cert. denied* 429 U.S. 885 (1976). Another has stated the purpose of the Act was to convey information to potential debtors in a manner which allows them to make intelligent, informed decisions as to the cost of available credit. *GAC Finance v. Burgess,* 16 Wash. App. 758, 558 P.2d 1386 (1977). *United Missouri Bank of Kansas City v. Robinson,* 7 Kan. App. 2d 120, 121, 638 P.2d 372 (1981), indicated that the TILA was to provide consumers with the information which would enable them to "shop around" for credit as they would any other item. See, *e.g., Gennuso v. Commercial Bank & Trust Co.,* 566 F.2d 437 (3rd Cir. 1977); *Zeltzery v. Carte Blanche Corporation,* 514 F.2d 1156 (3rd Cir. 1975); *Wachtel v. West,* 476 F.2d 1062 (6th Cir.), *cert. denied* 414 U.S. 874 (1973).

When Congress enacted the TILA, it gave the Federal Reserve Board paramount authority for implementing and interpreting the Act. The Board's power to prescribe regulations is extremely broad. Congress explicitly stated that the Board's regulations "may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper" to effectuate the purposes of the Act or facilitate compliance with the Act. 15 U.S.C. § 1604.

In addition to giving the Board broad regulatory powers, Congress provided in the Act itself that the disclosures required by the Act are to be made "in accordance with the regulations of the Board." 15 U.S.C. § 1631. Moreover, Congress has subsequently acted on two occasions to clarify the breadth of the Board's

interpretive powers, and on both occasions has indicated that the Board's interpretations should be deferred to by the court.

First, in 1974, Congress amended 15 U.S.C. § 1640 to add subsection (f). That subsection essentially states that no liability under the TILA may be imposed because of any act done or omitted in good faith in conformity with any rule, regulation or interpretation of the Act by the Board. Again, in 1976, Congress amended 15 U.S.C. § 1640(f) to specify that no liability could be imposed under the Act for conduct in conformity with any interpretation or approval by an official or employee of the Federal Reserve System authorized by the Board to issue inter-pretations or approvals.

For the purpose of this appeal the relevant portion of the TILA is 15 U.S.C. § 1637, which states:

"(a) Before opening any account under an open end consumer credit plan, the creditor shall disclose to the person to whom credit is to be extended each of the following items, to the extent applicable:

. . . .

"(7) The conditions under which the creditor may retain or acquire any security interest in any property to secure the payment of any credit extended under the plan, and a description of the interest or interests which may be so retained or acquired."

Also important is Regulation Z, 12 CFR § 226.1 *et seq.,* promulgated pursuant to the Federal Reserve Board's authority under the TILA. Regulation Z provides in part:

"(a) *Opening new account.* Before the first transaction is made on any open end credit account, the creditor shall disclose to the customer in a single written statement, which the customer may retain  . . .  each of the following items, to the extent applicable:

. . . .

"(7) The conditions under which the creditor may retain or acquire any security interest in any property to secure the payment of any credit extended on the account, and a description or identification of the type of the interest or interests which may be so retained or acquired." 12 CFR § 226.7.

Super Chief first argues on appeal that the appellant's coun-terclaims were not timely filed, thereby depriving the courts of the opportunity to rule on the merits of the case.

The trial court resolved this issue by ruling against Super Chief and Super Chief failed to cross-appeal. The issue is not before this court.

The resolution of the major issues in this case require that we first arrive at the proper method by which to construe the provi-

sions of the TILA. It has been held the TILA is remedial in nature and must be construed in favor of the consumer to effectuate the underlying Congressional purpose. *Bizier v. Globe Financial Services, Inc.,* 654 F.2d 1, 3 (1st Cir. 1981); *Cody v. Community Loan Corp. of Richmond Cty.,* 606 F.2d 499, 505 (5th Cir. 1979), *cert. denied* 466 U.S. 988 (1980); *Eby v. Reb Realty, Inc.,* 495 F.2d 646 (9th Cir. 1974); *Ed Marling Stores, Inc. v. Miracle,* 6 Kan. App. 2d 175, 181, 627 P.2d 352 (1981). In addition, a lender must strictly comply with the technical requirements of the TILA. 6 Kan. App. 2d at 185. *Wright v. Tower Loan of Mississippi, Inc.,* 679 F.2d 436, 444 (5th Cir. 1982); *Smith v. Chapman,* 614 F.2d 968, 971 (5th Cir. 1980).

A consumer alleging a violation of the TILA need not establish that he was actually deceived. *Griggs v. Provident Consumer Discount Co.,* 680 F.2d 927, 930 (3rd Cir. 1982); *Smith v. Chapman,* 614 F.2d at 971. The lender bears the burden of proving compliance with the Act. *Wright v. Tower Loan of Mississippi, Inc.,* 679 F.2d at 444.

However, other jurisdictions have interpreted the TILA more with equity in mind. In *Redhouse v. Quality Ford Sales, Inc.,* 511 F.2d 230, 237, *rev'd on other grounds,* 523 F.2d 1 (10th Cir. 1975), the court held "although the Act should be strictly construed, it would not serve the cause of justice to enforce the Act so as to achieve a means of harassment, oppression, or unjust enrichment." In *George v. General Finance Corp. of Louisiana,* 414 F. Supp. 33 (E.D. La. 1976), the court stated, "While the Truth in Lending Act is to be interpreted liberally for the protection of borrowers, it is to be read in a manner calculated to protect borrowers, not as a maze containing obscure technical pitfalls for creditors."

In *James v. Ford Motor Credit Co.,* 638 F.2d 147, 151 (10th Cir. 1980), it was stated that courts must use the Congressional intent behind TILA to both further the goals of the Act and produce an equitable result.

In *Dixey v. Idaho First National Bank,* 505 F. Supp. 846 (D. Idaho 1981), the court held it would liberally construe disclosure requirements under the TILA in favor of borrowers who were misled. On the other hand, borrowers who were not misled but merely seeking a windfall by finding a technical defect in a disclosure form which did not influénce choice of credit would

have the TILA construed against them. See also *Sanders v. Auto Associates, Inc.,* 450 F. Supp. 900 (D.S.C. 1978).

In reversing one Truth in Lending decision, the United States Supreme Court directed lower courts to not lose sight of the goals of the TILA, pointing out, "a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Anderson Bros. Ford v. Valencia,* 452 U.S. 205, 222 n. 20, 68 L.Ed.2d 783, 101 S.Ct. 2266 (1981).

Finally, in *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 568, 63 L.Ed.2d 22, 100 S.Ct. 790 (1980), the court held that "meaningful disclosure," within the context of the TILA, "does not mean *more* disclosure. Rather, it describes a balance between 'competing considerations of complete disclosure . . . and the need to avoid . . . [informational overload].' "

We hold the provisions of the TILA should be construed liberally to further the underlying Congressional purpose. At the same time, however, equitable considerations should be taken into account. There are times when the lender has made a good faith effort to comply with the uncertainities of the TILA and when the borrower. has not been misled or damaged. In these instances holding the lender liable would amount to nothing more than a windfall for the borrower. The purposes of the TILA are not served by harassment of well-intentioned lenders.

In light of these observations let us examine the issues in the case at bar.

Appellants argue the disclosure statement of April 13, 1977, was not timely furnished. They rely on *Forbes Credit Union v. Mewhinney,* 7 Kan. App. 2d 165, 638 P.2d 383 (1982). In *Forbes* the court focused on 15 U.S.C. § 1637(a) which mandates the required disclosures be given "before opening any account under an open end consumer credit plan." There the creditor and debtor had entered into an open end credit agreement on November 8, 1976. On November 15 the creditor made the first advance and obtained a security interest in the car purchased with the money. Contemporaneously the creditor provided the debtor with an application/disclosure statement similar to the one in the case at bar. Noting the account was "opened" November 8, 1976, the court held the disclosure statement was not timely, stating:

"Disclosure is required prior to the time a customer contractually binds himself

to accept particular credit terms. *Copley v. Rona Enterprises, Inc.*, 423 F. Supp. 979 (S.D. Ohio 1976). A disclosure made contemporaneously with the execution of the security agreement and disbursement of the loan does not meet the dictates of the Act or Regulation Z." 7 Kan. App. 2d at 169.

Let us examine the facts of this case in light of *Forbes* and our prior discussion of the proper construction of the TILA. Here Gilchrist in searching for a credit source for purchase of an automobile contacted his credit union, Super Chief, and made a loan request. There he was advised he could borrow the amount he sought. He signed an open end promise to pay (note) for the amount agreed upon April 11, 1977. Gilchrist then proceeded to negotiate his car trade and returned to Super Chief on April 13, 1977, with the information required for a security agreement, such as the description of the automobile. Super Chief and Gilchrist executed the security agreement at that time. Contemporaneously Gilchrist was furnished the disclosure statement required by the TILA and a check representing the proceeds of the loan. Thereafter, on April 14, 1977, Gilchrist deposited the check in his account, and wrote a check on his account in payment for his automobile. Until appellant had purchased the automobile, he had no obligation to Super Chief except to return its check. He was free to shop for other credit terms and sources if he so chose. The loan request contained the following provision:

"FOR VALUE RECEIVED, AND TO BE RECEIVED from time to time, I/we jointly and severally, promise to pay to the credit union named above all money or property advanced to the undersigned and to any other person at the request or for the benefit of the undersigned. For all such advances of money or property, I/we promise to pay according to the terms required of the undersigned as set out in a notice delivered personally to the undersigned or by regular mail sent to the last address of the undersigned as shown by the records of the above named credit union. Until otherwise properly notified of a change, the rate of interest and the minimum periodic payments shall be as set out prior to the time of consummation of each transaction."

The Disclosure Statement, which is also the Notice of Terms, provides in pertinent part:

**48**

CREDIT UNION APPLICATION – Notice of Terms · DISCLOSURE STATEMENT

| Robert G. Gilchrist<br>1421 N. Madison<br>Topeka, KS<br><br>Member's Name and Address | SUPER CHIEF CREDIT UNION<br>501 N. Lake    235-5911<br>Topeka, Kansas  66616<br><br>Credit Union Name and Address | 906$1.1<br>ACCOUNT NUMBER<br>PLAN or ADV NUMBER<br>4-13-77<br>DATE |
|---|---|---|

| AMOUNT OF THIS ADVANCE | Minimum Periodic Payment Required | Date of First Payment | FREQUENCY | ANNUAL PERCENTAGE RATE |
|---|---|---|---|---|
| Previous Balance $ -0-<br>Advance .... $ 1536.68<br>New Balance $ 1536.68 | $ 93.71<br>(except where a smaller payment shall reduce the balance to zero) | 5-15-77 | monthly | 12 %<br>Which is a periodic rate<br>of .03288 % per day |

This disclosure form is given to you pursuant to law and pursuant to our open end consumer credit plan. The member shall always have the privilege of paying the whole or any part of the obligation to the credit union on any day the credit union is open for business. The terms of repayment as set out above, however, may be altered by agreement between the member and the credit union.

**NOTICE:** See reverse side for important information regarding your rights to dispute statement errors.

The FINANCE CHARGE will be computed on the outstanding unpaid balance only at the ANNUAL PERCENTAGE RATE shown above for the actual time the balance remains unpaid There shall be no other change in the FINANCE CHARGE for prepayment or late payment.

Where a security agreement in the nature of a chattel mortgage has previously been given to the above named credit union and said Security Agreement has not been released or terminated, the credit union shall retain such security interest in the property therein described to secure payment of any credit extended on this open end plan until all liabilities to the credit union have been paid in full and then only upon a request for termination of the Security Agreement A true copy of the Security Agreement was heretofore furnished to the borrowing member at the time of the signing of the Security Agreement in accordance with the requirements of the Uniform Commercial Code Any balance in the member's share account shall also be security Where a payroll deduction authorization has previously been given to the members employer authorizing him to deduct money from the members pay each payroll period to be transmitted currently to the above named credit union, such authorization shall remain in effect until cancelled or altered by the undersigned in a written notice. This disclosure in no way alters the terms of said authorization.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of sex or marital status. The Federal agency which administers compliance with this law concerning this state chartered credit union is the Federal Trade Commission, Pennsylvania Avenue at 6th Street N.W., Washington, D. C 20580

Property Insurance if written in connection with this loan, may be obtained by the borrower through any person of the borrower's choice If the borrower desires property insurance to be obtained through the Credit Union, the cost will be $_____ for the term of the credit

Creditors Disability Insurance is not required to obtain this loan The cost of Creditors Disability Insurance from the Credit Union will be $ _____ for the term of the credit if paid in accordance with the terms as set out above I/WE wish to obtain Creditors Disability Insurance at the cost stated above, from the Credit Union

Date 4/1_____ Signature_____

By accepting money or property identified above under "Amount of the Advance" the person(s) above named agree to pay the above named credit union according to the terms of the open end promise previously signed by them and now on file in the office of the above named credit union, and on such terms as shown on this disclosure statement The terms of repayment as set out above shall supersede any previous notice of terms for the plan number shown above.

I We hereby acknowledge receipt of a copy of this disclosure statement appropriately filled in prior to consummation of this transaction, and that it is correct

X _Robert H Gilchrist_
SIGNATURE OF BORROWER IF DESIRED

# The Security Agreement provides:

## SECURITY AGREEMENT

| 1  Debtor(s) (Last name first) and address(es) | 2. Secured Party (Credit Union) and address | Other Debtors and Guarantors (if applicable) |
|---|---|---|
| Gilchrist, Robert G.<br>1421 N. Madison<br>Topeka, Kansas | SUPER CHIEF CREDIT UNION<br>501 N. Lake<br>Topeka, Kansas 66616 | |
| * CREDIT UNION ACCT. NO.  9061 | DATE   4-13-77 | |

This security agreement covers the following types (or items) of property and all accessions and accruals

1972 Buick Century

The undersigned hereby grant to the above named credit union a security interest in the property herein described and any and all additions and accessions thereto to secure payment of all obligations and all liabilities of the signers to this agreement to the credit union The security interest herein granted shall secure such additional sums which may hereafter be advanced by the credit union to or on behalf of the undersigned for any purpose, with interest on such sums at rates of interest to be fixed at the time of advancing such additional sums; provided, however, that the making of such advances shall be optional with the credit union, and such advances may be made and repaid and again made as often as may be seen fit by the credit union, and this security agreement shall secure the payment of any and all extensions or renewals and successive extensions or renewals of any obligations or any indebtedness and all interest on the same, for all of which this security agreement shall stand as continuing security until paid, and the signers hereto agree that the credit union may apply any payments made on any obligations to the credit union at the option of the credit union, and such advances or other obligations shall be secured by this agreement whether evidenced by notes, checks, drafts or otherwise.

The documentation in *Forbes* was the same as here.

Appellants admit they were neither misled nor damaged by the timing of the disclosure statement but argue the TILA is a remedial statute which must be construed in the consumer's favor. They claim the failure to disclose the credit terms prior to the signing of the security agreement is a technical violation of the Act entitling them to the relief sought, citing *Forbes,* 7 Kan. App. 2d 165; *Goldman v. First Nat. Bank of Chicago,* 532 F.2d 10 (7th Cir. 1976); and *Lirtzman v. Spiegel, Inc.,* 493 F. Supp. 1029 (N.D. Ill. 1980).

Super Chief relies on 12 C.F.R. 226.7(a) (Regulation Z) for its argument the disclosures were timely made. Regulation Z states the required disclosures must be given "before the first transaction is made on any open end credit account." It further argues Regulation Z makes it possible for a consumer to apply for credit, have the application approved, and receive the initial disclosure statement before accepting credit on the account. We agree. Even though the consumer has arranged for credit, he does not have to accept it. He is free to shop around for a better deal with the arranged credit as a fall-back position. There is no obligation to the creditor until the proceeds of the loan have been deposited. That is the first transaction.

We are persuaded Super Chief Credit Union complied with Regulation Z and the provisions of the TILA in the delivery of its disclosure statement to Gilchrist. Gilchrist had all of the credit information prior to his negotiation of Super Chief's check. He had the privilege of shopping for other credit and comparing the terms if he so desired. He chose to use the credit he applied for. The date of the disclosure statement did not prevent credit shopping. To the extent it conflicts with this holding *Forbes* is overruled.

Finally, appellant maintains the disclosure statement failed to strictly comply with the requirements of the TILA and Regulation Z, particularly with regard to future security.

15 U.S.C. § 1637(a)(7) requires a lender in an open end credit transaction to disclose the conditions under which he "may retain or acquire any security interest in any property to secure the payment of any credit extended under the plan . . . ." Appellants argue Super Chief's disclosure statements did not inform them of the circumstances under which the lender would "ac-

quire" a security interest in the property purchased with subsequent advances. This is not true. All the security Super Chief had or could ever acquire or retain under the original security agreement was the items named. Any additional security or exchange of security was subject to a subsequent agreement of the parties. The actions of the parties bear this out. When Gilchrist wanted to exchange automobiles he went to the lender and negotiated a new security agreement freely and voluntarily, giving Super Chief a security interest in the car which was purchased. Both disclosure statements accurately apprised Gilchrist of this. There was no deception on the part of Super Chief and Gilchrist was neither misled nor damaged. Super Chief's disclosure statements were meaningful in that they apprised appellants of the amount of the loan, the interest rate, monthly payments and that the security for the loans was the automobiles and Gilchrist's account in Super Chief. It is hard to imagine what more the credit union could have done to further the TILA goal of informing the consumer.

For these reasons we refuse to enter into "word games between lenders and borrowers in which a borrower's attorney who is adept at using legalese and arguing technicalities is awarded a prize for himself and his client." *Sanders v. Auto Associates, Inc.*, 450 F. Supp. at 902. The decision of the Court of Appeals is reversed. The judgment of the trial court is affirmed.

FROMME, J., not participating.