No. 56,571

R. Denise Manley, *Appellee,* v. Wichita Business College,
*Appellant.*

(701 P.2d 893)

Opinion filed June 21, 1985.

*F. C. (Rick) Davis II,* of Bruce, Davis & Gilhousen, of Wichita, argued the cause and was on the brief for appellant.

*Stephen B. Plummer,* of Rumsey, Richey & Plummer, of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

Herd, J.: This is an action brought under the Kansas Consumer

Protection Act and the federal Truth in Lending Act for deceptive practices of Wichita Business College. The jury found for the plaintiff, Denise Manley. Actual damages, civil penalties and attorney fees were awarded. Wichita Business College appeals.

Wichita Business College is a vocational school governed by the Kansas State Department of Education. The school offers a curriculum consisting of computer programming, accounting, bookkeeping, court reporting, drafting, career secretarial, and receptionist programs. All students must have a high school diploma or a GED, and all students must take an admission test and achieve a score indicating probable success in the chosen area of study. Each student must also pay an enrollment fee of $50.

Appellee, Denise Manley, first became interested in attending the college on July 20, 1981, when she saw an advertisement in the *Wichita Eagle-Beacon* stating the school was accepting applications for enrollment in geologic drafting. Appellee was interested in this field because her husband worked in the oil fields, there seemed to be good job prospects, and because salaries were good. She called the college for more information. Appellee talked to Mike Frazee at the college. Frazee is a full time "career counselor" for the college. His job involves recruiting for the college and his salary is based in part on a percentage of the tuition paid by each student he recruits. Frazee assured appellee the school offered the geologic drafting program and he invited her to come to the college for an interview.

Appellee and her husband went to the school on August 7, 1981, and met with Frazee, who was introduced as a "career counselor." Appellee advised Frazee she wanted to study geologic drafting, which she understood would cost $300 and would last four weeks. Frazee confirmed the college offered the program, but he also told appellee the geologic drafting course was only an "experiment," the job prospects in the area were somewhat uncertain, the work was tedious, the pay was quite low, and perhaps appellee might want to enroll in the regular drafting course instead. The regular drafting course cost $3,695.00. Frazee called in the drafting instructor, Mr. Kennedy. Kennedy likewise warned appellee geologic drafting was not a wise choice and that she should enroll in drafting instead.

Appellee had qualms about the drafting program, however,

because she had only a GED and was not good in mathematics. Both Frazee and Kennedy assured appellee she had sufficient education and training to complete the drafting curriculum. Appellee's score on the admission test was high enough to permit enrollment in drafting; however, her math score was substantially lower than her vocabulary score.

The Manleys had anticipated a $300 tuition cost, but now were confronted with a $3,695.00 obligation. They discussed financial aid matters with Frazee and later with the college financial aid officer, Darol Moseley. The college utilizes the various state and federal aid programs to assist students in financing their education. The programs include the Basic Educational Opportunity Grant (BEOG), Supplemental Educational Opportunity Grant (SEOG), the National Direct Student Loan (NDSL), and the Guaranteed Student Loan (GSL). The student may also obtain a loan through the Higher Education Loan Program of Kansas (HELP), if a bank is unwilling to make a GSL loan to the student.

Frazee outlined the various financial aid programs available to appellee, obtained financial information for the Manleys, and gave them various forms to complete. Moseley also gave appellee a document entitled "Acceptance and Notice of Financial Aid Award" indicating she would receive a BEOG in the amount of $872 and a HELP loan in the amount of $2,500 for a total financial aid package of $3,372. Appellee understood that she had applied for and received the BEOG and the HELP loan, but no other financial assistance.

Classes began on August 17, 1981. On that date, Moseley met with appellee to be sure her account was in order. He then had her sign additional aid documents. Appellee believed these were related to the HELP and BEOG programs. However, the documents were related to the NDSL program and included an application, a promissory note, and an exit interview. Moseley also had appellee endorse a check in the amount $1,000 for deposit in her account with the school. Appellee believed this was the first installment on her HELP loan, but it was actually a check drawn on the college's "cash-NDSL account" in the amount of $1,000 and represented a "temporary" NDSL. Appellee testified the NDSL documents were substantially blank when she signed them, most of the writing was not hers, and she signed them in reliance on Moseley's representations it was the

right thing to do. According to Frazee and Moseley, the purpose of the "temporary" NDSL is to insure each student has "immediate enrollment funds" on account when classes start. Moseley testified the NDSL checks are not actually cashed unless they are needed. Hence, if a student receives other financial aid money, the NDSL checks are never cashed and the loan check is voided. If the student, however, withdraws or does not receive other financial aid money, the school can convert the dormant NDSL loan into a live loan obligation by depositing the previously endorsed check. All financial aid checks come directly to the school, not to the student. Mosley testified the college received the first installment of appellee's HELP loan on October 22, 1981, in the amount of $1,143.75, and appellee endorsed the check to the college. Nevertheless, the college did not void the NDSL obligation. Moseley had no explanation why this was not done. Appellee subsequently withdrew from the college in January of 1982. On February 8, 1982, the second installment of the HELP loan came in. Appellee refused to sign the check because she was dissatisfied with the college. The college then deposited the NDSL check for $1,000 in March of 1982, and credited that amount to her account. This was more than three months after appellee withdrew from the college. Moseley testified the college often applied NDSL funds to a student's account after the student was no longer enrolled.

In September 1981, shortly after enrolling, appellee was involved in an automobile accident which caused her to take a leave of absence from the college. She notified the college and the Dean of Education, Faith Kite, advised her the college would not charge tuition for any time missed. When appellee returned in November, she experienced substantial difficulty with the course work because of her physical condition and because of her lack of mathematical training. After the automobile accident it was discovered appellee had epilepsy. When she returned to school she was still suffering from epileptic seizures. For various reasons, appellee withdrew from the college in January 1982. After appellee withdrew, the college advised her she was obligated to pay tuition for the time she missed, despite her leave of absence. Kite testified that a student is not charged for "interrupt" time if the student withdraws, instead of returning, but the student is charged for the time missed if the student returns after the "interrupt."

On March 15, 1982, the college sent appellee a statement indicating her unpaid balance due was $1,456.75, which represented the unpaid balance of tuition calculated supposedly in accordance with the college's refund policy. A notation on the statement indicated appellee did not have an NDSL obligation. At the bottom of the statement, Moseley asked appellee to endorse her second HELP check over to the school which would reduce her obligation to the school. On the same date, the college deposited the NDSL check previously endorsed by appellee. Appellee's first notification of the existence of the NDSL loan came in a letter from the college to appellee's husband on May 5, 1982, wherein the controller for the college advised Mr. Manley that appellee owed $456.75 to the college, which was $1,000 less than the previous statement. Appellee then sued the college for violations of the Kansas Consumer Protection Act and violations of the Truth in Lending Act. The college counterclaimed for $470.45.

The jury found the college had committed four separate violations of the Kansas Consumer Protection Act and found actual damages of $2,000 for one violation but no actual damages for the other violations. The court subsequently awarded a civil penalty of $100 for each of the violations, plus attorney fees in the amount of $1,500. The court also assessed a civil penalty in the amount of $1,000 for the college's admitted violation of the Truth in Lending Act, plus additional attorney fees of $500. The jury found for the appellee on the college's counterclaim. The court denied all other claims for relief. At the hearing on post-trial motions, the court sustained appellee's motion for additional attorney fees and awarded an additional $500 under the Kansas Consumer Protection Act.

Appellant first contends the trial court erred in denying its motion for a directed verdict or new trial because there was insufficient evidence to support the jury's verdict finding it violated the Kansas Consumer Protection Act.

Appellee alleged six deceptive acts or practices under the Kansas Consumer Protection Act. Of the six the jury found there was evidence to support four. The four acts or practices the jury found deceptive were (1) the intentional use, in any oral or written representation, of exaggeration or ambiguity as to mate-

rial fact; (2) the intentional failure to state material fact, or in the alternative, intentional concealment, suppression, or omission of a material fact, whether or not any person actually has been misled; (3) offering property or services without intent to sell them; and (4) offering property or services without intent to supply reasonable, expectable public demand, unless the offer discloses the limitation. The jury found there was not sufficient evidence to find representations had been made knowingly or with reason to know property or services had uses or benefits that they did not have; nor that the college falsely stated, knowingly or with reason to know, a consumer transaction involves consumer rights, remedies or obligations.

We have held when a verdict is attacked on the ground it is contrary to the evidence, it is not the function of this court on appeal to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in a light most favorable to the successful party below, will support the verdict this court should not intervene. *Timsah v. General Motors Corp.*, 225 Kan. 305, Syl. ¶ 1, 591 P.2d 154 (1979). Additionally, we have stated whether a deceptive act or practice has occurred under the Kansas Consumer Protection Act is not a question of law for the court, but rather a question of fact for a jury to decide. See *Waggener v. Seever Systems, Inc.*, 233 Kan. 517, 522, 664 P.2d 813 (1983).

In this case the jury rendered its verdict finding four separate violations of the Kansas Consumer Protection Act. If there is substantial competent evidence to support that verdict, we must uphold it.

The college argues there was no evidence of intentional use by the college, in any oral or written representation, of exaggeration or ambiguity as to any material fact, because Manley decided on her own to take the regular drafting course rather than the geologic drafting course, after being advised of the advantages of the drafting course and the disadvantages of the geologic drafting course. Appellant also argues appellee was fully aware of the costs of the class and the financial aid available, and she had ten days between talking to the college representatives and enrolling in which to look over the material and make a decision.

The college also argues no evidence existed of its intentional

failure to state, or intentional concealment, suppression, or omission of a material fact. It contends the jury's verdict penalizes it for fully discussing the differences between the classes and for telling appellee about her financial aid options, which made it easier for her to enroll in the more expensive drafting class.

Appellant's final argument as to insufficiency of the evidence is that there was no evidence appellee was ever told she could not take the geologic drafting class or that it was not offered. Hence, it is argued there is insufficient evidence for the jury to conclude the college offered services without intent to sell them or to supply reasonable public demand.

Appellee argues there is abundant evidence supporting the jury's verdict. Appellee first notes there was substantial competent evidence the appellant made exaggerated and ambiguous representations of material fact concerning the curriculum and appellee's ability to benefit from the training.

Appellee points to the position of the college's "career counselor," whose salary was based in part on commissions received from each student he recruited. Here the "counselor" received a substantially larger commission by appellee's taking the regular drafting class, which cost $3,695, rather than the $300 geologic drafting class. Further, the counselor admitted he was a "recruiter" for the college. Appellee testified because of the counselor's title, she assumed his job was to make assessments of student skills and vocational aspirations and advise them on career choices.

Appellee notes the comment to K.S.A. 50-626 of the Kansas Consumer Protection Act, which defines and prohibits deceptive acts and practices, states the statute was modeled after section five of the Federal Trade Commission Act. Therefore, appellee argues it is proper to utilize FTC regulations and guidelines in interpreting that statute.

The FTC has addressed the subject of deceptive acts and practices in connection with vocational schools. See 16 C.F.R. § 254.1 *et seq.* (1985). Regarding "career counselors," the FTC has stated the following to be a deceptive act or practice:

"An industry member should not deceptively designate or refer to its sales representatives as 'registrars,' 'counselors,' 'advisors,' or by words of similar import or misrepresent in any other manner, the titles, qualifications, training, experience or status of its salesmen, agents, employees, or other representatives." 16 C.F.R. § 254.7(b) (1985).

Therefore, appellee argues there is substantial factual and legal evidence that the reference to the college's recruiter and salesman as a "career counselor" was per se a deceptive practice.

Additionally, appellee argues she was misled in believing she qualified for a drafting program or that she had any aptitude in drafting. One of the qualifications for drafting, as listed in the school catalog, is math skills. Appellee tested much higher in verbal skills, but she was still above the school's mathematical limit for qualifying for the drafting program. She was therefore allowed to enroll. Evidence was admitted, however, that almost all students passed the admissions test and those who did not were allowed to retake the test. Appellee again cites the FTC's regulation, which states:

"An industry member should endeavor to establish the qualifications which an applicant should have to assimilate successfully the subject matter of the course. Applicants should be informed of these prerequisites, and those who are not so qualified should not be enrolled." 16 C.F.R. § 254.5(c) (1985).

Based on the evidence and legal arguments, the jury found the college had intentionally made exaggerated and ambiguous oral and written representations as to material facts, and found the plaintiff had sustained damages in the amount of $2,000 as a result. The judge also assessed a $100 civil penalty based on this evidence.

Appellee next indicates there was substantial competent evidence supporting the jury's finding that the college had intentionally concealed, suppressed, or omitted material facts in connection with the financial aid and the tuition refund policy.

As previously stated, the college argues it merely provided information on financial aid to appellee and allowed her to make her own choices regarding the application for that aid.

At enrollment, appellee was assisted in filling out applications for a HELP loan, under which she would qualify for $2,500; and a BEOG grant, under which she would qualify for $872. The total tuition was $3,695, not including the registration fees. With appellee's loan and grant she was therefore obligated to the school personally for $423 to be made in twelve monthly installments of $36. Since the money from the loan and the grant are sent to the educational institution in the student's name, appellee was also required to sign a promissory note to the college

for the full amount of tuition, thereby personally obligating her to the school for the money for tuition.

On the first day of class appellee signed additional financial aid documents. She thought they were related to the HELP loan and BEOG grant. In actuality they were an application and check for a "temporary" National Direct Student Loan (NDSL) for $1,000. Thus, the college held a $1,000 check for appellee made out to the school. Evidence was admitted that each student at the college received this "temporary" NDSL to be used as "immediate enrollment funds" until the funds from HELP arrived. The school keeps these signed NDSL checks only until the financial aid money arrives and then they are voided. This is a safeguard for the school in case the financial aid money is not issued for some reason after the student has begun classes.

On October 22, 1981, appellee received her first installment from HELP in the amount of $1,143.75. She endorsed the check for payment to the college. Despite the fact the HELP check arrived and exceeded the amount of the temporary loan, the NDSL check was not voided.

Later, when appellee had dropped out of classes after becoming dissatisfied with the school and had refused to pay the balance of the tuition for the full program since she was no longer participating, the college deposited appellee's NDSL check without advising her it had such a check or that it intended to deposit it.

Additionally, appellee alleges she was misled regarding the tuition refund policy. Appellee was on medical leave from September 9 to October 12, when she returned and stayed until November 30. At that time she left, feeling she could no longer continue, for medical reasons. She was encouraged by the school to return and did so for night classes on January 25, 26 and 28. She then quit those classes because there was no full-time instructor in the night class.

Appellee inquired as to the school's tuition refund policy. She was told if a student withdraws, any prepaid tuition, which has not been utilized, is refunded based on a schedule. She was also told students are not charged for time missed, such as with her medical leave. The actual policy is that students are not charged for time missed if they terminate after their leave; however, if they return to class and then terminate, as appellee did, they are

charged as though they were continuously enrolled and participating. Appellee testified she was actively encouraged by the school to return after her medical leave. This, appellee asserts, was done in order to charge her for her time missed.

Based on this evidence, the jury found the college had intentionally concealed, suppressed or omitted a material fact, regardless of whether appellee was misled. The jury found no actual damages in connection with this violation, but the judge assessed a civil penalty, based on this evidence, in the amount of $100.

Appellee next asserts there was substantial competent evidence supporting the jury's finding that the college offered geologic drafting without intent to sell the program, but rather with the intent of selling the more expensive drafting program.

The geologic drafting program was advertised in the newspaper as a $300 four-week course. When appellee inquired about the program, she was told the six-month $3,695 drafting program was a better course, and appellee thereby agreed to enroll in the full drafting program.

The college's witnesses were uncertain whether there was an actual geologic drafting course offered when the advertisement was placed in the newspaper. One individual testified there was a program and six people were enrolled in it. The drafting teacher testified geologic drafting was taught to those enrolled in regular drafting, if they asked to be so trained, and without an additional charge. He also testified the advertisement was run in the paper only to satisfy the various oil companies who had requested the school provide such a program. Geologic drafting was not listed as a course in the school's catalog.

K.S.A. 50-626(b)(5) controls bait and switch operations. These have been defined by the FTC as:

"Bait advertising is an alluring but insincere offer to sell a product or service which the advertiser in truth does not intend or want to sell. Its purpose is to switch consumers from buying the advertised merchandise, in order to sell something else, usually at a higher price or on a basis more advantageous to the advertiser. The primary aim of the bait advertisement is to obtain leads as to persons interested in buying merchandise of the type so advertised." 16 C.F.R. § 238.0 (1985).

One element indicative of a bait and switch operation has been set out by the FTC as:

"Use of a sales plan or method of compensation for salesmen or penalizing

salesmen, designed to prevent or discourage them from selling the advertised product." 16 C.F.R. § 238.3(f) (1985).

The school recruiter received a much higher commission based upon his enrollment of appellee in the regular drafting course, as opposed to her enrollment in the geologic drafting course. This is indicative of a bait and switch.

Based on this evidence and legal criteria, the jury found the college had offered property or services without intent to sell them. The jury found no actual damages in connection with this violation; however, the judge imposed a civil penalty in the amount of $100.

Next, appellee argues there is substantial competent evidence to support the jury's finding that the college offered services without intent to supply reasonable, expectable public demand and that the college offered such services without disclosing limitations on the availability of such services.

The law relating to this count is set out in K.S.A. 50-626(b)(6). It differs from the provisions of K.S.A. 50-626(b)(5), the bait and switch provision, in that in this count a supplier is obligated to provide for reasonable demand and advertise limits on supply.

At trial, appellee alleged the limitation that existed but was not disclosed was that the geologic drafting program was only offered to students already enrolled in the regular drafting course. Additionally, there was evidence the advertised geologic drafting course did not even exist and the ad was run only to satisfy oil companies who had requested that the school provide such a program.

Based on this evidence, the jury found the school offered property or services without intent to supply reasonable, expectable public demand and the offer did not disclose the limitation which existed. It found no actual damages on this point, but the judge again assessed a $100 civil penalty for the violation.

Hence, viewing the evidence, although controverted, in the light most favorable to appellee, as required on appeal, there is substantial competent evidence to support the jury's findings of four violations of the consumer protection act.

Appellant next argues the jury's verdict was a result of passion and prejudice. The evidence which appellant contends prejudiced the jury was that appellee's daughter had died prior to

enrollment and that her medical leave from school was due to an auto accident, after which it was diagnosed that appellee had epilepsy.

Appellee responds that the epilepsy information was important since it was directly related to her medical leave of absence and her ability to continue in the course. Her testimony regarding this was not detailed and was not dwelled upon.

The information concerning the death of appellee's daughter was elicited on cross-examination by appellant's counsel. We have held a party may not invite error and then complain of that error on appeal. *Grimm v. Pallesen,* 215 Kan. 660, Syl. ¶ 3, 527 P.2d 978 (1974). This evidence was admitted through the college's own efforts. Therefore, it is not allowed to raise this issue on appeal.

The jury's action in finding only four of the six allegations of consumer violations by the college and the reduction of the damage claims is inconsistent with passion and prejudice. This issue is without merit.

Appellant next argues there was no support for the trial court's invoking the penalty provisions of the Kansas Consumer Protection Act since there was no prejudice to appellee and appellant's conduct was not intentional.

Appellee responds initially that violations of K.S.A. 50-626(b)(5) and (6) do not require a finding of intent; therefore, none need be proven by appellee. See *Swanston v. McConnell Air Force Base Fed'l Cred. Union,* 8 Kan. App. 2d 538, 542, 661 P.2d 826 (1983). For violations of K.S.A. 50-626(b)(2) and (3), intent is required. Those statutes define a deceptive act or practice as the "intentional use, in any oral or written representation, of exaggeration, innuendo or ambiguity as to material fact"; and "the intentional failure to state a material fact, or the intentional concealment, suppression or omission of a material fact, whether or not any person has in fact been misled." The word "intentional" is not defined in the Kansas Consumer Protection Act and no instruction defining such was given to the jury in this case. Appellee argues, therefore, the definition of "intentional" as defined by K.S.A. 21-3201, governing criminal intent, as an act "purposeful" and "not accidental" should be utilized in determining intent in this case. In these regards appellee argues the college did not "accidentally" have appellee apply for the

NDSL loan; fail to inform appellee of what she was doing; apply the proceeds of the loan to the tuition appellee refused to pay because she felt it was not owed; talk appellee into taking the regular expensive drafting course, rather than the geologic drafting course. Hence, appellee asserts the intent requirement of 50-626(b)(2) and (3) of the Kansas Consumer Protection Act was proven. Additionally, appellee cites *Hass v. Preferred Risk Mutual Ins. Co.*, 214 Kan. 747, 751, 522 P.2d 438 (1974), wherein we held that because the jury returned a verdict for appellee, on appeal the court must conclude the jury resolved the issue of intent against the appellant, which in this case is the college.

Appellee also urges prejudice was proven in that she was induced to enroll in a $3,695 program when she intended to enroll in a $300 program; she was not refunded her prepaid tuition; and she was obligated by the school to repay a loan, the NDSL, for which she did not know she had applied. The existence of the actual damages is proof of prejudice even though actual damages are not required in consumer protection cases. *Watkins v. Roach Cadillac, Inc.*, 7 Kan. App. 2d 8, 15, 637 P.2d 458 (1981), *rev. denied* 230 Kan. 819 (1982). We hold the college's acts were intentional and Manley was prejudiced thereby.

Appellant next argues the trial court erred in assessing a civil penalty of $1,000 for the college's violation of the federal Consumer Credit Code (Truth in Lending Act, 15 U.S.C. § 1601 *et. seq.* [1982]), since student loans are exempt from the act.

For support, appellant cites 15 U.S.C. § 1603(6) (1982), which exempts from the Truth in Lending Act:

"Loans made, insured, or guaranteed pursuant to a program authorized by title IV of the Higher Education Act of 1965 . . . ."

Hence, appellant argues the loans involved in the transaction with appellee are exempt.

Appellee responds that it is not the student loans which are in question, but rather the promissory note entered into between appellee and the college obligating appellee to pay the full amount of tuition within 182 days, after which she is to pay 18% interest on any unpaid principal.

The promissory note is not a part of the student loans. The loans were merely a mechanism by which appellee would pay her obligation created by the promissory note. Hence, the promissory note is not exempted from the Truth in Lending Act.

Next, appellant argues that although it admits the promissory note is in violation of the Truth in Lending Act, the civil penalties were improper because there was good-faith compliance and no finance charge was collected whereby the court could determine the penalty.

For support that good faith compliance is sufficient, appellant cites *Super Chief Credit Union v. Gilchrist*, 232 Kan. 40, 653 P.2d 117 (1982), wherein we held:

"Where a lender has made a good faith effort to comply with the Truth in Lending Act and the borrower has been neither misled nor damaged, the penalty provision of the act will not be invoked." 232 Kan. 40, Syl. ¶ 2.

Appellee argues *Super Chief* is distinguishable from this case in that in *Super Chief* the court held: "It is hard to imagine what more the credit union could have done to further the TILA goal of informing the consumer." 232 Kan. at 50. In this case, however, appellee received almost no information about the transaction involving the promissory note. The amount financed, the amount which will be credited to appellee's account to discharge her obligation, the sum of the amount financed and the finance charge, and information about payments are all essential elements required by the TILA which are missing from the promissory note. There is no evidence of a good-faith attempt to comply with the act.

Appellant also argues the amount of the penalty is improper since the note does not disclose a finance charge. Appellant asserts where the finance charge is missing, the judge may only assess the minimum $100 fine, rather than the maximum $1,000 assessed in this case.

When a creditor violates the TILA, a consumer may recover actual damages and a civil penalty "twice the amount of any finance charge in connection with the transaction." 15 U.S.C. § 1640(a)(2)(A)(i) (1982). There was no finance charge designated on the promissory note. The finance charge includes, however, various components including interest (15 U.S.C. § 1605[a][1] [1982]), which was shown on the note. The interest was 18% per annum after 182 days. If there is absolutely no way to determine the finance charge the consumer is entitled to recover only the $100 minimum penalty. See *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 376, 36 L.Ed.2d 318, 93 S.Ct. 1652 (1973). If, however, the finance charge can be computed, even if

not disclosed, the creditor is liable for a penalty of twice the amount of the finance charge which would have been imposed if the consumer had paid the obligation in regular installments. See *Willis v. American National Stores*, 350 F. Supp. 173, 177 (N.D. Ga. 1972).

Thus, there was evidence to support the court's assessment of the $1,000 maximum fine.

The judgment of the trial court is affirmed.