Raychelle **MERRIAM**, Plaintiff and Appellant,

v.

Todd **MERRIAM**, Defendant and Appellee.

No. 890484–CA.

Court of Appeals of Utah.

Oct. 16, 1990.

---

Brent H. Bartholomew (argued) and Waine Riches, Utah Legal Services, Inc., Provo, for plaintiff and appellant.

Kenneth M. Hisatake (argued), Salt Lake City, for defendant and appellee.

Before BENCH, GREENWOOD and JACKSON, JJ.

GREENWOOD, Judge:

Appellant Raychelle Merriam appeals from a divorce decree awarding custody of her son, Drew Merriam, to his father, Todd Merriam. We affirm.

## BACKGROUND

Raychelle and Todd were married on November 22, 1985. Raychelle's son from an earlier marriage, Carson Draper, born December 18, 1983, lived with them. Drew Merriam was born to the parties on June 3, 1986.

The parties separated in April 1988. Raychelle took Carson and Drew and moved in with her parents. Divorce proceedings were begun in July 1988. In August 1988 the parties stipulated that custody of the boys would remain with Raychelle pending the final divorce decree, sub-

ject to Todd's right of reasonable visitation every weekend.

In September 1988, Raychelle moved for a custody evaluation by the Utah State Department of Social Services, to aid in determining permanent child custody. The motion was granted, but Raychelle challenged the qualifications of the Social Services worker initially appointed to perform the evaluation. Accordingly, John Bagley, a licensed clinical social worker, was assigned to the case. He performed the evaluation and submitted his report to the trial court and to counsel for both parties in mid-June 1989. The report indicated that both Raychelle and Todd were competent parents and that the children themselves had no preference as to which parent should have custody. Finding "very little to base an objective judgment on," Mr. Bagley nonetheless recommended that Todd be granted custody of Drew. The reasons for this recommendation, described as "more judgmental than pure fact," included assessments that Todd's social support, financial condition, personal planning skills, and ability to discipline the children were all superior to Raychelle's.

Trial took place on August 2, 1989. Most issues other than child custody were disposed of by stipulation.[1] With respect to Carson, the trial court found that it lacked jurisdiction regarding custody because his natural father had not been made a party to the proceedings.[2] Raychelle's custody of Carson thus was left undisturbed. However, finding that the relationship between Todd and Carson had essentially been that of father and son, the court granted Todd visitation rights with Carson.

The trial therefore centered on the issue of which party should receive custody of Drew. In addition to each party testifying, each presented three additional witnesses. Testimony was heard regarding the parties' earning capacities, assumption of caretaking duties, babysitting arrangements, and the general environment provided for Drew by each parent. The child custody report was not formally introduced into evidence, although Raychelle's counsel attempted at one point to attack its reliability, then later used it in an effort to impeach Todd's testimony.

Each party also expended much effort attempting to prove misconduct by the other. Todd testified that he had seen Raychelle slap Carson on the face on several occasions. Todd also reported that Raychelle had, during the marriage, admitted sexual infidelity. He produced a male witness who, when asked if he had engaged in sexual relations with Raychelle during her marriage, responded, "I'll plead the Fifth on that one." Raychelle claimed that Todd had engaged in threatening and assaultive behavior toward her and that he abused drugs and alcohol. She asserted that Todd, not she, had been sexually unfaithful during the marriage.

After conclusion of the trial, the court found that the best interests of Drew would be served by awarding custody to Todd, with liberal visitation by Raychelle and Carson. The specific findings supporting that decision were:

18. The environment which is available to the minor child, Drew Merriam, through Defendant and Defendant's family, friends, and relatives is more favorable than the environment which would be provided by the Plaintiff.

19. The Defendant's financial capabilities are greater and more sound than that of the Plaintiff because Plaintiff lacks specific job related skills whereas Defendant has job related skills.

20. The Defendant and Defendant's environment will provide a better social climate for the minor child Drew Merriam.

21. The evaluator appointed by the Court, John N. Bagley, LCSW, has recommended that custody of Drew Merriam be awarded to the Defendant, Todd Merriam, subject to visitation privileges in favor of the Plaintiff.

1. There was disagreement as to Raychelle's monthly income, but the trial court's finding on this dispute is not at issue in this appeal.

2. Carson's natural father paid child support of $150 per month to Raychelle. He lived in Nevada and visited Carson infrequently.

Mr. Bagley, in part, has supported his recommendation on the basis that Todd Merriam would have a much stronger social support system in the Manti area than the Plaintiff.

22. The Plaintiff has had a tendency to strike Carson Draper on his face, whereas the Defendant does not. The Court does not view this factor as a material consideration in its decision.

23. The Defendant is a patient father and reflects his love and concern for the children in his activities with the children and in tending the children.

24. The Plaintiff has engaged in extramarital sexual activites [sic] with men, not her husband. The parties['] past conduct and morality favor Defendant as the custodial parent for Drew Merriam.

25. The Plaintiff has not been honest with the Court in this trial.

26. The Defendant and Plaintiff have both provided primary care for the minor children in such activities as bathing, clothing, feeding, changing of diapers, and general care of the children.

27. The religious education provided by the Plaintiff and Defendant is approximately equal.

28. The court specifically finds that the Defendant has not shown physical violence or abusive conduct during the marriage.

On appeal, Raychelle asserts that the trial court erred in the following respects: (1) The trial court based custody on the child custody report, which was not properly in evidence; (2) The trial court based Drew's custody on Raychelle's unsubstantiated "extramarital affairs," and thereby abused its discretion; (3) The trial court erred in not finding Raychelle to be the primary caretaker of Drew during the pendency of the divorce; and (4) The trial court gave insufficient weight to the desirability of keeping Carson and Drew together.

## ANALYSIS

### The Custody Evaluation Report

■ We first address Raychelle's claim that the trial court erred by relying on Mr. Bagley's report in making its custody decision. Raychelle does not challenge the admissibility per se of the custody evaluation report.[3] Instead, she argues that reliance on the report was improper because it was never formally admitted into evidence. We find no reversible error in the inadvertent failure to perform the usual incantations to admit the report into evidence.

We first note that child custody evaluations in divorce cases are specifically provided for by Rule 4–903, Utah Code of Judicial Administration (1990). The rule provides that the evaluator "shall submit a written report to the court," and thereby clearly contemplates that such reports will be used in making custody determinations. Code of Jud.Admin.R. 4–903(2). Raychelle also received a copy of the report well before trial, and had ample time to object to its being considered by the court. Her failure to raise this concern at trial precludes her from raising it on appeal. *State v. Eldredge*, 773 P.2d 29, 34–35 (Utah 1989); Utah R.Evid. 103(a)(1).

In addition, the trial court's reliance on the report was invited by Raychelle. At trial, Raychelle's counsel first mentioned the report and twice drew the court's attention to it.[4] A party who leads a court into

---

3. Indeed, we find no reasonable basis for such challenge. With one minor exception, the report addressed all thirteen factors required by Rule 4–903, Utah Code of Judicial Administration, in child custody evaluations. Mr. Bagley did not directly address factor (3)(E)(iii), the "ability to provide personal rather than surrogate care" for the child(ren). However, under consideration of factor (3)(F), "financial condition," he noted that both parties work full-time. This clearly implies that either party awarded

custody would have to rely to a significant extent on "surrogate" care for the child.

4. It can be argued that the conduct of Raychelle's counsel in calling the court's attention to the report for a second time amounted to an offer to admit the report into evidence, or at least a waiver of any objection to its admission. Counsel was attempting to use the report in cross-examining Todd. When Todd's counsel objected that the report was being mischaracterized, Raychelle's counsel ceased his cross-exami-

error cannot later complain of that error to obtain reversal. *Helman v. Paterson*, 121 Utah 332, 241 P.2d 910, 913 (Utah 1952); *see also Manley v. Wichita Business College*, 237 Kan. 427, 701 P.2d 893, 901 (1985) (evidence elicited on cross-examination cannot be complained of by eliciting party on appeal); *Green v. Green*, 176 Mont. 532, 579 P.2d 1235, 1237 (1978) (no reversible error where appellant acquiesced, participated in, or made no objection to trial court's ruling or procedure).

Raychelle also argues that the custody evaluation report was improperly relied on because the evaluator was never qualified as an expert or called as a witness at trial. Rule 706(a), Utah R.Evid., provides that a court-appointed expert *may* be called as a trial witness, but this is not mandatory.[5] Neither party nor the court was required to call Mr. Bagley; anyone, including Raychelle, could have called him as a witness. Once again we decline to find reversible error arising from appellant's own failure to act.

In sum, we are unpersuaded by Raychelle's argument on appeal that the report should not have been relied on because it was not admitted and because Mr. Bagley did not testify in person[6] for the fundamental reason that she failed to take any affirmative actions at trial to advance those arguments.

### *"Extramarital Affairs" as Related to Custody*

We turn next to Raychelle's contention that the trial court abused its discretion in basing its custody decision on "unsubstan-

tiated" allegations that she had engaged in extramarital sex while still living with Todd. We view this contention as having two components: first, that the court's finding that Raychelle had engaged in extramarital sex was clearly erroneous; second, that it was an abuse of discretion to base custody on such a finding.

■ To show clear error in a finding of fact, the challenging party must marshal all evidence supporting the finding, *Turnbaugh v. Anderson*, 793 P.2d 939, 941 (Utah Ct.App.1990), and show that the finding is nevertheless against the great weight of the evidence. *Riche v. Riche*, 784 P.2d 465, 468 (Utah Ct.App.1989); *Maughan v. Maughan*, 770 P.2d 156, 159 (Utah Ct.App.1989). Additionally, due regard must be given to the trial court's ability to judge the credibility of witnesses. Utah R.Civ.P. 52(a).

■ Raychelle asserts that the trial court lacked any supporting evidence to find that she had engaged in extramarital sex. She argues that the court improperly relied upon Todd's witness's invocation of the privilege against self-incrimination when asked if he had had intercourse with Raychelle. However, even disregarding this testimony, the court heard other evidence to support its finding. This evidence consisted of Todd's testimony that Raychelle had admitted to sexual infidelity during the marriage.[7] Although Raychelle denied infidelity, we defer to the trial court's assessment that Todd's testimony was more credible, and find no clear error in its finding.

---

nation with the comment, "Well, I'll let the report talk for itself because I think it's pretty clear."

5. The relevant portion of Rule 706 provides that a court-appointed expert "shall advise the parties of his findings, if any; his deposition *may* be taken by any party; and he *may* be called to testify by the court or any party. He *shall* be subject to cross-examination by each party, including a party calling him as a witness." (Emphasis added.) We read the mandatory language "shall be subject to cross-examination" to be dependent on the permissive, "may" language regarding the taking of depositions or calling the expert as a trial witness.

6. Raychelle does not fully articulate her argument regarding Mr. Bagley's failure to testify, but we assume it is based on a hearsay theory, as well as his qualifications as an expert.

7. The testimony as to Raychelle's statement was admissible as a non-hearsay admission of a party-opponent. Rule 801(d)(2), Utah R.Evid. And, since used in an action between spouses, the statement falls outside the interspousal communication privilege of Utah Code Ann. § 78–24–8(1)(b)(i) (Supp.1990).

■ Nor do we find that the trial court abused its discretion in considering Raychelle's sexual conduct in making its custody decision. Utah Code Ann. § 30–3–10(1) (1989) provides that in custody determinations pursuant to divorce, the trial court "shall consider the best interests of the child and the past conduct and demonstrated moral standards of each of the parties." The statute has been construed to mean that parental moral character is but one of numerous factors that the trial court may consider in determining the child's best interest. *See Sanderson v. Tryon,* 739 P.2d 623, 627 (Utah 1987).

Here the trial court's decision was not based solely upon its findings as to Raychelle's sexual conduct. The written findings demonstrate that it considered other factors relevant to Drew's best interests.[8] Those factors included the environments available to Drew through each party and the parties' financial situations. Both testimonial evidence, as well as the custody evaluation report, favored Todd as to each of these factors. Therefore, because it did not rely solely on Raychelle's sexual conduct, the trial court did not abuse its discretion in considering that conduct in awarding custody of Drew to Todd.

### The "Primary Caretaker"

■ Raychelle's next contention is that the trial court erred in not finding her to be Drew's primary caretaker during the pendency of the divorce, and by not giving such finding adequate weight in making its decision.

The trial court's written findings state only that Todd and Raychelle "have both provided primary care for the minor children in such activities as bathing, clothing, feeding, changing of diapers, and general care of the children." However, on review we are not limited to written findings, and may properly examine findings expressed solely from the bench or contained in other court documents, such as court memoranda. *Erwin v. Erwin,* 773 P.2d 847, 849 (Utah Ct.App.1989); Utah R.Civ.P. 52(a). In this case, the trial court's minute entry and trial transcript reveal its finding that "I have not been convinced either party is the primary caretaker, that they both care for the children to the best of their ability when they've been in their care." Thus the written finding is clarified by other record information.

Raychelle does not argue that this finding was clearly erroneous.[9] Instead, she contends that the trial court confused the term "primary caretaker" with the ability to care for Drew. Because of the discretion accorded to the trial court in child custody disputes, we will not reverse for "confusion" unless such confusion is clearly demonstrated to us. Here, Raychelle has shown nothing to compel us to abandon the presumption that the trial court "meant what it said and said what it meant" when it found neither party to be Drew's primary caretaker, and we will not disturb that finding.

In *Paryzek v. Paryzek,* 776 P.2d 78 (1989), this court held that in custody decisions, a trial court must, because of the child's need for stability, consider the nature and duration of pre-existing custody arrangements. *Id.* at 82. We also indicated that when the call is otherwise close, this consideration may warrant awarding

---

8. Factors that may be considered include the identity of the primary caretaker during the marriage; the identity of the parent with greater flexibility to provide direct rather than surrogate care; the identity of the parent who has had the most time with the child(ren) during the pendency of the divorce, if lengthy; and the stability of the environment provided by each party. *Pusey v. Pusey,* 728 P.2d 117, 120 (Utah 1986). The trial court may also consider the desirability of keeping siblings together; the relative bond strength between each party and the child(ren); kinship with the child(ren), includ-

ing stepparent status; and financial condition. *Hutchison v. Hutchison,* 649 P.2d 38, 41 (Utah 1982).

9. Nor does our review of the record reveal clear error. The parties stipulated on August 10, 1988 that during the action's pendency Raychelle would have custody of Drew subject to visitation every weekend with Todd. The liberal visitation, along with Todd's testimony that he availed himself of the visitation and provided primary care during the visits, supports the finding that neither party was the primary caretaker during the pendency of the divorce.

permanent custody, as a matter of law, to the party who was primary caretaker during the pendency of the divorce. *Id.* at 83–84. In *Davis v. Davis,* 749 P.2d 647 (Utah 1988), the Utah Supreme Court stated that in a custody dispute between fit parents, "considerable weight" should be given to the identity of the primary caretaker. *Id.* at 648. *See also Pusey v. Pusey,* 728 P.2d 117, 120 (Utah 1986) (identity of parent with whom child has spent most time pending divorce is factor to consider in custody decision). Here, because the trial court specifically found that neither parent had been Drew's primary caretaker during the pendency of the divorce, and because the balance of factors did not otherwise tip in favor of the custodial status quo, the holdings in *Davis* and *Paryzek* are inapplicable.

### *Separation of the Siblings*

 Raychelle's final contention is that the trial court gave inadequate weight to the desirability of keeping Drew and his half-brother Carson together. Because the children had lived together since they were both very young, this issue is resolved by referring to the law regarding split custody of full siblings.

The desirability of keeping siblings together is a legitimate factor to consider in deciding custody. *Hutchison v. Hutchison,* 649 P.2d 38, 41 (Utah 1982). However, the preference for keeping siblings together is not binding when other considerations favor dividing them. *Pusey,* 728 P.2d at 120 (citing *Jorgenson v. Jorgenson,* 599 P.2d 510, 512 (Utah 1979)).

Here the trial transcript reveals the trial court's acknowledgment that "split custody is a serious remedy and frankly, I don't like it. But under the terms and under the evidence that I heard today, I think it is for the best interest of the child Drew that this order [granting custody to Todd] take effect." As already noted, in making its custody decision, the trial court considered appropriate factors and made findings related to those factors that were not clearly erroneous. The trial court's comments indicate that it found those other factors sufficiently important to outweigh the desirability of keeping Drew and Carson together. Once again, we find no abuse of discretion in this aspect of the trial court's decision.

### CONCLUSION

 We pause in closing to note, as did the trial court, that child custody decisions in divorce are often heart-wrenching and extremely difficult. The process involved in determining a child's best interests often fails to yield crystal clear answers. This being the case, the discretion of the trial court must be respected. *See Deeben v. Deeben,* 772 P.2d 972, 973 (Utah Ct.App. 1989). The judgment of the trial court, awarding custody of Drew Merriam to his father, Todd Merriam, is affirmed.

BENCH and JACKSON, JJ., concur.