**Kevin ROSS, Plaintiff,**

v.

**CREIGHTON UNIVERSITY, Defendant.**

No. 89 C 6463.

United States District Court,
N.D. Illinois, E.D.

June 14, 1990.

Louis S. Goldstein, Cindy G. Fluxgold, Bruce S. Kreisman, Goldstein & Fluxgold, Chicago, Ill., for plaintiff.

D. Patterson Gloor, Lynn D. Dowd, Cassiday, Schade & Gloor, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

One day in July 1987, Kevin Ross, a former college basketball player, barricaded himself in a high-rise hotel room in downtown Chicago and threw assorted pieces of furniture out the window. As Ross currently recalls it, the defenestrated furniture "symbolized" the employees of Creighton University, whose alleged misdeeds he blames for the onset of this "major depressive episode." Ross now sues the university in contract and tort. The gist of Ross's Amended Complaint is that Creighton caused this episode and otherwise injured him by recruiting him to attend the school on a basketball scholarship while knowing that Ross, who scored 9 points out of a possible 36 on the American College Test, was pitifully unprepared to attend Creighton, which is a private school whose average student in the year Ross matriculated, 1978, scored 23.2 points on the ACT.

Although Creighton is located in Omaha, Nebraska, where it is certainly amenable to suit, Ross wants to sue the school in Chicago, where he currently resides. Creighton removed this case from the Circuit Court of Cook County on the basis of diversity, and then moved to dismiss under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction, or, in the alternative, under Rule 12(b)(6) for failure to state a claim on which relief can be granted. For the reasons stated below, the motion to dismiss on jurisdictional grounds is denied, but the motion to dismiss for failure to state a claim is granted.

Because Ross's original complaint did not clearly delineate his theories of relief, the Court directed him to file an amended complaint setting forth his claims in separate counts, as required by Fed.R.Civ.P. 10(b). The Court also permitted supplemental briefing of Creighton's motion to dismiss, which had been filed in response to the original complaint. As amended, the complaint alleges the following story.

*Complaint*

Ross, who is 6 feet and 9 inches tall, was a high school basketball star in Kansas City, Kansas, when Creighton recruited him. Creighton knew that Ross could not handle college-level studies, but kept him eligible for the basketball team by recommending that he enroll in "bonehead" (Ross's description) courses, such as ceramics, marksmanship, and the respective theories of basketball, track and field, and football. Under its rules, the university would not have accepted the pursuit of this esoteric curriculum by a non-athlete. After four years, when his basketball eligibility expired, Ross had earned only 96 of the 128 credits required to graduate, maintaining a "D" average. His reading skills were those of a seventh-grader; his overall language skills, those of a fourth-grader.

In order to get Ross remedial education, representatives of Creighton made arrangements for Ross to attend Chicago's Westside Preparatory School, an elementary and high school whose founder, Marva Collins, has drawn national attention for her abilities as an educator. As it name suggests, Westside Prep is a school for children, not for adults. Ross says that Creighton representatives made four trips to Chicago to discuss Ross's enrollment. The agreement to enroll Ross is spelled out in a letter dated July 29, 1982, from Collins to Creighton's athletic director. The letter, countersigned by a Creighton official and returned to Collins, obligated Creighton to pay for Ross's tuition, special tutoring, books and living expenses. Ross attended Westside in 1982 and 1983. He later attended Roosevelt University, also located in Chicago, but dropped out after 1985 for want of money. Ross's furniture-throwing outburst took place on July 23, 1987. He was arrested and ordered to make restitution in the amount of $7,500.

Ross's Amended Complaint is in three counts. The first count is styled simply as "Negligence," but its theory is recondite. The Court defers to the explanation given by Ross's lawyers: "It intertwines ele-

ments of 'negligent infliction of emotional distress' with 'educational malpractice' to assert defendant's negligence in recruiting and repeatedly re-enrolling an athlete utterly incapable—without substantial tutoring and other support—of performing the academic work required to make educational progress, failing to provide such assistance, then taking additional measures, such as enrolling plaintiff in a remedial elementary school program, which contributed to the emotional problems plaintiff experienced from his academic failure at CREIGHTON." Plaintiff's Supplemental Memorandum, at 6 (capitalization the plaintiff's here and where quoted elsewhere).

The second and third counts are for breach of contract. The second count alleges that Creighton breached a written contract, which is described as consisting of the documents relating to Ross's enrollment at Creighton, as well as the documents relating to his enrollment at Westside Prep. The substance of Ross's theory is that Creighton had a contractual obligation to provide him sufficient educational and financial support so that he "would have a reasonable opportunity to obtain a meaningful education." Plaintiff's Supplemental Memorandum, at 8. The third count is in the alternative, and is in essence identical to the second, except it alleges that the agreement for Ross to attend Creighton constituted an oral, rather than a written, contract.

*Personal Jurisdiction*

■ Because subject matter jurisdiction rests on diversity, this Court has personal jurisdiction of Creighton only if an Illinois state court would. *FMC Corp. v. Varonos,* 892 F.2d 1308, 1310 (7th Cir.1990). "Under Illinois law, the party seeking to establish personal jurisdiction must make out a prima facie case.... In deciding a motion to dismiss, the court must accept all undenied factual allegations and resolve all factual disputes in favor of the party seeking to establish jurisdiction." *Saylor v. Dyniew-*

*ski,* 836 F.2d 341, 342 (7th Cir.1988). Illinois recognizes two types of personal jurisdiction. The broadest is the common law "doing business" doctrine, which gives an Illinois court general jurisdiction over any cause of action against a person whose contacts with the state are so substantial that he can be deemed to be doing business here. *Asset Allocation & Management Co. v. Western Employers Ins. Co.,* 892 F.2d 566, 570 (7th Cir.1989). A more narrow form of personal jurisdiction is predicated on the state long-arm statute, Ill.Rev. Stat. ch. 110, para. 2–209, which gives an Illinois court specific jurisdiction of any cause of action arising from the commission of one of the acts listed in the statute. *Asset Allocation & Management,* 892 F.2d at 569–70. Any assertion of personal jurisdiction is limited by the due process clause of the fourteenth amendment. *See generally Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–78 & 473 n. 15, 105 S.Ct. 2174, 2181–85, & 2182 n. 15, 85 L.Ed.2d 528 (1984).[1]

■ The Court cannot agree with Ross that Creighton does business in Illinois. In large part, Ross bases his claim that Creighton does business here on the fact (assumed on this motion to dismiss) that Creighton employs a full-time recruiter in Illinois to encourage residents to attend Creighton and supports its recruitment with direct-mail to prospective students. These efforts apparently have paid off for the university; approximately 290 to 370 Illinois residents—approximately 5% to 7% of Creighton's students—attend the school during any particular school year. Moreover, Creighton recruits basketball players in Illinois, and between 1978 and 1989, awarded nine basketball scholarships to Illinois residents, as well as "a significant number [of scholarships] in other sports." Amended Complaint ¶ 4.

But as the Illinois courts have repeatedly reaffirmed, "[the] rule has consistently

---

1. This lawsuit was filed in state court on July 21, 1989. Effective September 7, 1989, a broadened form of the long-arm statute took effect, extending the jurisdiction of the Illinois courts to the limits of the fourteenth amendment. *See*

1989 Ill.Legis.Serv. 4069 (West). Because the lawsuit was filed before the broadened version took effect, the Court applies the statute as it stood prior to its amendment. *FMC Corp.,* 892 F.2d at 1310 n. 5.

been held as requiring activities greater than solicitation by employees who have only authority to solicit business in this State." *Cook Associates, Inc. v. Lexington United Corp.*, 87 Ill.2d 190, 57 Ill.Dec. 730, 735, 429 N.E.2d 847, 852 (1981). The activities described above fall squarely within this principle, for mere solicitation of students to purchase Creighton's educational services is not materially different than mere solicitation of customers to buy products from an out-of-state business. *Cf. Radosta v. Devil's Head Ski Lodge*, 172 Ill.App.3d 289, 122 Ill.Dec. 302, 526 N.E.2d 561 (1st Dist.1988) (Wisconsin ski lodge did not do business in Illinois by soliciting Illinois residents to ski in Wisconsin).

Ross attempts to plead more than mere solicitation by pointing to Creighton's membership in an athletic conference with three member schools from Illinois (Bradley University, Illinois State University and Southern Illinois University) and Creighton's participation in athletic competitions in Illinois. For example, between 1978 and 1989, Creighton's basketball team played 38 games in Illinois, and its other athletics teams have participated in "a significant number of athletic contests" here as well. Amended Complaint ¶ 5. Nevertheless, these additional facts still are not enough for the Court to find Creighton to be doing business in Illinois.

In order to be doing business in Illinois, Creighton's contacts must be "continuous, permanent, ongoing and systematic . . . not occasional or casual." *Reeves v. Baltimore & Ohio R.R. Co.*, 171 Ill.App.3d 1021, 122 Ill.Dec. 145, 148, 526 N.E.2d 404, 407 (1st Dist.1988). These connections must show, in Judge Cardozo's words, " 'a fair measure of permanence and continuity.' " *Maunder v. DeHavilland Aircraft of Canada*, 102 Ill.2d 342, 80 Ill.Dec. 765, 769, 466 N.E.2d 217, 221 (quoting *Tauza v. Susquehanna Coal Co.*, 220 N.Y. 259, 115 N.E. 915, 917 (1917)), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984). That is to say, Creighton's activities must be such that the university can be deemed to be "constructively present in Illinois." *Colletti v. Crudele*, 169 Ill.App.3d 1068, 120 Ill.Dec. 311, 318, 523 N.E.2d 1222, 1229

(1st Dist.), *appeal denied*, 122 Ill.2d 571, 125 Ill.Dec. 213, 530 N.E.2d 241 (1988).

Participating in a handful of athletic contests each year does not rise to the level of constructive presence in Illinois, because the contacts, though regular from year to year, are simply too few in number to be considered permanent and continuous. In *Cook Associates*, for example, the Illinois Supreme Court held insufficiently permanent and continuous the occasional business trips to Illinois made by defendant's employees, even though one of defendant's executives had attended three trade shows in Chicago in the course of two years, and another employee had accompanied representatives of the defendant's independent Illinois distributor when making sales calls. 57 Ill.Dec. at 736, 429 N.E.2d at 853. In *Colletti*, by contrast, a trucking company was held to be doing business in Illinois because its trucks had made thirty-one stops in the state over three years, and had passed through the state fifty-four times in the same period. 120 Ill.Dec. at 315, 319, 523 N.E.2d at 1226, 1230. This Court previously rejected a claim of doing business jurisdiction against an Indiana military academy that regularly recruited Illinois residents and whose sports teams "occasionally participated in sporting events in the state." *Harding v. Culver Education Foundation*, No. 84 C 6133, slip op. at 4 (N.D.Ill. March 12, 1985). It does so once again with respect to Creighton.

■ Unlike the plaintiff in *Harding*, however, Ross can make a claim of personal jurisdiction under the Illinois long-arm statute. Ross asserts personal jurisdiction over Creighton pursuant to Ill.Rev.Stat. ch. 110, para. 2–209(a)(1), which gives the state courts jurisdiction of causes of action arising from "[t]he transaction of business within this State." According to the Amended Complaint, Creighton's representatives came into Illinois on four occasions to discuss Ross's enrollment at Westside Prep. Creighton also sent its acceptance of Marva Collins's proposed terms to Illinois, as well as the payments it was required to make under their agreement. "Courts have found the solicitation or negotiation of

a contract in Illinois sufficient to constitute transaction of business under Section 2–209." *J.J. & J. Foundation Co., Inc. v. Tommy Moore, Inc.*, 640 F.Supp. 1119, 1122 (N.D.Ill.1986). *See also id.* at 1122 n. 4 (discussing cases). *Compare Chalek v. Klein*, 193 Ill.App.3d 767, 140 Ill.Dec. 760, 763–64, 550 N.E.2d 645, 648–49 (2d Dist. 1990) (personal jurisdiction appropriate where out-of-state defendant enters Illinois to negotiate contract). Furthermore, to the extent that Ross contends Creighton's enrollment of him in Westside Prep was tortious, jurisdiction of this claim can also be hung upon § 2–209(a)(1). *In re Oil Spill by Amoco Cadiz*, 699 F.2d 909, 915 (7th Cir.1978) ("A cause of action need not be contractual to be within section [2–209(a)(1) ]."), *cert. denied*, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 172 (1978). Jurisdiction likely would arise as well under § 2–209(a)(2), dealing with the commission of "tortious acts."

Against this reasoning, Creighton makes an argument that appears to blend the law of the Illinois long-arm statute and the fourteenth amendment due process limitation on personal jurisdiction of out-of-state residents. Creighton argues in part that assuming it entered into a contract with Westside Prep, "plaintiff would then have to demonstrate that defendant knew it was contracting with an Illinois resident." Defendant's Surreply, at 7. But of course Creighton knew that it was entering into a contract with an Illinois resident, because Westside Prep is located in Chicago. Creighton goes on to argue, however, that it would have to know that *Ross* was an Illinois resident at the time the contract was formed, yet all it cites in support is one case that says nothing of the sort. *See Empress Int'l Ltd. v. Riverside Seafoods, Inc.*, 112 Ill.App.3d 149, 67 Ill.Dec. 891, 894, 445 N.E.2d 371, 374 (1st Dist.1983) ("What is important is that defendant voluntarily entered into a business transaction with an entity he knew, or should have known, was an Illinois resident."). Ross was certainly a foreseeable third-party beneficiary of the contract, possibly with rights to enforce the agreement, and it was further foreseeable that Ross would be an

Illinois resident during the time of its performance. And in any event, all that the long-arm statute requires is that the cause of action arise out of the transaction of business or the commission of a tortious act in Illinois; it says nothing about the foreseeability of a particular plaintiff's residence.

Nor is the foreseeability of a particular plaintiff any part of the due process limitation on personal jurisdiction. But this is not the same thing as saying foreseeability does not matter at all, for the Supreme Court has made clear that under the fourteenth amendment, a person must be given fair warning that his actions might subject him to suit in a state before he must answer to its courts. " '[T]he foreseeability that is critical to due process analysis ... is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.' " *Burger King v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)). "Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum ... and the litigation results from alleged injuries that 'arise out of or relate to' those activities...." *Id.* 471 U.S. at 472, 105 S.Ct. at 2182 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) and *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984)).

The Court can see no constitutional difficulty here insofar as Ross's complaint is predicated upon Creighton's enrollment of him in Westside Prep. In so doing, Creighton purposefully directed its activities toward Illinois, and this resulting litigation stems from injuries allegedly arising from or relating to those activities. *See id.* But Ross is also seeking to recover for alleged wrongs done him in connection with

Creighton's recruitment of him to play basketball in Omaha, Nebraska. Because Ross was a resident of Kansas at that time, it would have been impossible for Creighton to foresee that recruiting Ross would make it subject to suit in Illinois. Perhaps sensitive to this difficulty, Ross attempted in the Amended Complaint to tie Creighton's allegedly wrongful conduct with respect to its enrollment of Ross at Creighton to Creighton's allegedly wrongful conduct with respect to its enrollment of Ross in Westside Prep. For example, the Amended Complaint alleges with regard to the tort claim: "[T]he defendant reasonably should have known that enrolling the plaintiff at CREIGHTON ... and then subsequently enrolling the plaintiff with grade schoolers would or could cause plaintiff to suffer emotional distress and illness." Amended Complaint ¶ 15. With respect to the contract claims, the Amended Complaint alleges: "The defendant entered into the written contract with Westside Preparatory School ... in an effort to fulfill defendant's obligations under the agreement [to enroll Ross at Creighton]." *Id.* ¶ 29.

Although the point is not without difficulty, the Court concludes that under the Illinois long-arm statute and consistent with the fourteenth amendment, it has personal jurisdiction of Creighton for the entire cause of action. The Court does not believe that for purposes of determining personal jurisdiction it must divide into two parts a cause of action pleaded to allege one continuous wrong involving acts that took place both here and in Nebraska. Under Rule 12(b)(2), the plaintiff gets the benefit when there is any doubt about jurisdiction. *Weidner Communications, Inc. v. His Royal Highness Prince Bandar Al Faisal,* 859 F.2d 1302, 1306 n. 7 (7th Cir. 1988).

### Causes of Action

■ A complaint may be dismissed for failure to state a claim only if, taking as a true all well pleaded factual allegations and drawing all reasonable inferences in favor of plaintiff, " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Corcoran v. Chicago Park District,* 875 F.2d 609, 611 (7th Cir. 1989) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). But "[i]f the complaint fails to allege a requisite element necessary to obtain relief, dismissal is in order." *R.J.R. Services, Inc. v. Aetna Casualty and Surety Co.,* 895 F.2d 279, 281 (7th Cir. 1989).

A peculiarity of this case is that both sides call for the Court to apply Illinois law, even though most of the conduct at issue has nothing to do with this state.[2] Creighton and Ross in effect have stipulated to Illinois law by failing to argue that Nebraska law applies, for " 'when the parties fail to consider a choice of law in a diversity case, the substantive law of the forum is presumed to control.' " *Rush Presbyterian St. Luke's Medical Center v. Safeco Ins. Co.,* 825 F.2d 1204, 1206 (7th Cir.1987) (applying Illinois contract law to claim brought by Chicago hospital against Seattle surety on bond made in Miami) (quoting *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 681 n. 33 (7th Cir.1986), *cert. denied,* 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987)). *See also Weidner,* 859 F.2d at 1307 (applying Illinois rather than Saudi Arabian contract law because parties did not raise question as to choice of law). *Compare Doe v. First Nat'l Bank of Chicago,* 865 F.2d 864, 871 & n. 6 (7th Cir.1989) (express choice-of-law stipulation honored).

Permitting this type of implicit stipulation makes sense for both theoretical and practical reasons. Theoretically speaking, it does not matter which state's law is applied if the choice of law does not affect the outcome (*Hartford v. Burns Int'l Security Services,* 172 Ill.App.3d 184, 122 Ill. Dec. 204, 205, 207, 526 N.E.2d 463, 464, 466 (1st Dist.1988), *appeal denied,* 124 Ill.2d

---

**2.** See generally the memoranda in support of Creighton's motion to dismiss, as well as Ross's responsive memorandum at 11, which states: "Whether an educational malpractice claim is viable is a question of first impression in Illinois." Creighton's willingness to apply Illinois law is particularly odd given its objections to personal jurisdiction.

562, 129 Ill.Dec. 149, 535 N.E.2d 914 (1989)), and practically speaking, the Court is under no obligation to raise and research points of law for the parties (*Int'l Administrators, Inc. v. Life Ins. Co. of North America,* 753 F.2d 1373, 1376 n. 4 (7th Cir.1985)). Because Creighton and Ross have failed to argue that Nebraska law calls for a different outcome, the Court will apply Illinois law, in accordance with the parties' apparent wishes. *See id.* ("Conflicts rules are appealed to only when a difference in law will make a difference to the outcome."). In other words, the parties have apparently represented to the Court that the result should be the same regardless of which state's law is applied.

### Ross's Tort Claim

That settled, the Court takes up Ross's tort claim. As mentioned above, Ross says this claim is a hybrid of "negligent infliction of emotional distress" and "educational malpractice." Plaintiff's Supplemental Memorandum, at 6. These strands of tort law "intertwine" to form the novel tort of "negligence in recruiting and repeatedly re-enrolling an athlete utterly incapable—without substantial tutoring and other support—of performing the academic work required to make educational progress," exacerbated by the enrollment of plaintiff in a school with children half his age and size. *Id.* Before considering the merits of this tort, the Court must unravel its separate threads.

Educational malpractice is a tort theory beloved of commentators, but not of courts. While often proposed as a remedy for those who think themselves wronged by educators (see, e.g., J. Elson, *A Common Law Remedy for the Educational Harms Caused by Incompetent or Careless Teaching,* 73 Nw.U.L.Rev. 641 (1978); Comment, *Educational Malpractice,* 124 U.Pitt.L.Rev. 755 (1976)), educational malpractice has been repeatedly rejected by the American courts (see, e.g., *Peter W. v. San Francisco Unified School District,* 60 Cal.App.3d 814, 131 Cal.Rptr. 854 (1976); *Hoffman v. Board of Education of City of New York,* 49 N.Y.2d 121, 424 N.Y.S.2d 376, 400 N.E.2d 317 (1979); *Donohue v.*

*Copiague Union Free School District,* 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1979); *Wilson v. Continental Ins. Co.,* 87 Wis.2d 310, 274 N.W.2d 679 (1979); *D.S.W. v. Fairbanks North Star Borough School District,* 628 P.2d 554 (Alaska 1981); *Hunter v. Board of Education,* 292 Md. 481, 439 A.2d 582 (1982); *Tubell v. Dade County Public Schools,* 419 So.2d 388 (Fla.App.1982)).

The closest any case cited to this Court has come to accepting a cause of action for educational malpractice is *B.M. v. State of Montana,* 200 Mont. 58, 649 P.2d 425 (1982), which nevertheless failed to muster a majority of the state Supreme Court's seven justices in favor of the tort. In that case, a plurality of three held that the state constitution and education statutes created a duty of reasonable care in testing and placing a child in an appropriate special education program. The concurring justice expressly denied that the child could recover on a claim of educational malpractice, but concluded that she had a cause of action to redress the denial of her constitutional and statutory rights. The three dissenting justices agreed with the concurrence that educational malpractice had no place in Montana's tort law. So rather than provide reasons to adopt the tort, *B.M.* illustrates the common law's extreme reluctance to embrace it.

■ Whether to create a cause of action for educational malpractice is, of course, a question for the Court, which determines as a matter of law whether a duty runs from defendant to plaintiff. *Felty v. New Berlin Transit, Inc.,* 71 Ill.2d 126, 15 Ill. Dec. 768, 374 N.E.2d 203 (1978). It is a matter of considering sound social policy, guided by looking to " '[t]he likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing that burden upon defendant.' " *Scott & Fetzer Co. v. Montgomery Ward & Co.,* 112 Ill.2d 378, 98 Ill.Dec. 1, 5, 493 N.E.2d 1022, 1026 (1986) (quoting *Lance v. Senior,* 36 Ill.2d 516, 224 N.E.2d 231, 233 (1967)). This federal Court, sitting in diversity, must predict how Illinois courts would resolve this issue. *Stifle v. Marathon Pe-*

*troleum Co.*, 876 F.2d 552, 558 (7th Cir. 1989).

Ross's argument from precedent is weak. He contends that Illinois cases suggest the courts' willingness to impose a duty to "non-negligently admit, counsel and educate students who may require special attention" (Plaintiff's Response, at 11), but cites two cases dealing with the duties of property owners to handicapped persons (*Erne v. Peace*, 164 Ill.App.3d 420, 115 Ill.Dec. 517, 517 N.E.2d 1203 (2d Dist.1987); *Hodges v. Jewel Companies*, 72 Ill.App.3d 263, 28 Ill.Dec. 571, 390 N.E.2d 930 (2d Dist.1979)). He also contends that the cases from other jurisdictions rejecting educational malpractice claims did not involve private colleges or universities. Response Memorandum, at 9. But *Wilson v. Continental Ins. Co.*, 87 Wis.2d 310, 274 N.W.2d 679 (1979), rejected what was in effect an educational malpractice claim against a private university, though the magic words "educational malpractice" were not used in the opinion.

*Wilson* is in key respects similar to this case. A former law student sued Marquette University for encouraging him to take a course in "mind control" before beginning law school. The plaintiff said that the course caused him to suffer severe psychological disorders (he dropped out of school and sought extended professional treatment) because he " 'was taught a method of mind control but was not taught how to control it.' " *Id.* 274 N.W.2d at 681 (quoting the complaint). Marquette should have known better, he argued. In rejecting this claim, Judge Coffey, writing for the court, reasoned in part that to impose a duty of care would put insufferable strains upon educators, forcing them to "litigate every suit claiming negligence in the selection of curriculum, teaching methods, teachers or extra curricular activities," and that educators cannot be expected to foresee "mental injuries ... arising from taking an educational course." *Id.* at 686.

This Court believes the same general concerns would lead the Illinois courts to reject the tort of educational malpractice. Admittedly, the term "educational malprac-

tice" has a seductive ring to it; after all, if doctors, lawyers, accountants and other professionals can be held liable for failing to exercise due care, why can't teachers? *Cf. Donohue*, 418 N.Y.S.2d at 377, 391 N.E.2d at 1353. The answer is that the nature of education radically differs from other professions. Education is an intensely collaborative process, requiring the interaction of student with teacher. A good student can learn from a poor teacher; a poor student can close his mind to a good teacher. Without effort by a student, he cannot be educated. Good teaching method may vary with the needs of the individual student. In other professions, by contrast, client cooperation is far less important; given a modicum of cooperation, a competent professional in other fields can control the results obtained. But in education, the ultimate responsibility for success remains always with the student. Both the process and the result are subjective, and proof or disproof extremely difficult.

Judge Wachtler, concurring in *Donohue*, made the foregoing point well, noting "the practical impossibility of proving that the alleged malpractice of the teacher proximately caused the learning deficiency of the plaintiff student," because "[f]actors such as the student's attitude, motivation, temperament, past experience and home environment may all play an essential and immeasurable role in learning." *Id.* 418 N.Y.S.2d at 379, 391 N.E.2d at 1355. This is especially true of college education, which usually puts the onus of course selection and attendance on the student. And though Judge Wachtler spoke of "proximate cause," his point holds true when considering the existence of duty as well, because the two doctrines, insofar as they consider foreseeability, blend at the margin into an overall consideration of whether tort recovery should be permitted as a matter of policy. *See Drobney v. Federal Sign & Signal Corp.*, 182 Ill. App.3d 471, 131 Ill.Dec. 833, 835, 539 N.E.2d 186, 188 (4th Dist.), *appeal denied*, 127 Ill.2d 614, 136 Ill.Dec. 584, 545 N.E.2d 108 (1989); W. Keeton, D. Dobbs, R. Kee-

ton & D. Owen, *Prosser and Keeton on Torts* § 42 (5th ed. 1984).

It also must be remembered that education is a service rendered on an immensely greater scale than other professional services. If every failed student could seek tort damages against any teacher, administrator and school he feels may have shortchanged him at some point in his education, the courts could be deluged and schools shut down. *See Donohue,* 418 N.Y.S.2d at 379, 391 N.E.2d at 1355; *Wilson,* 274 N.W.2d at 686. The Court believes that Illinois courts would avert the flood and the educational loss. This is not to say that the mere worry that litigation will increase justifies a court's refusal to remedy a wrong; it is to say that the real danger of an unrestrained multiplication of lawsuits shows the disutility of the proposed remedy. If poor education (or student laziness) is to be corrected, a common law action for negligence is not a practical means of going about it.

█ Having concluded that Illinois would not recognize a cause of action for educational malpractice, the Court considers negligent infliction of emotional distress. As a general rule, courts have been reluctant to permit recovery upon this theory. *See Prosser and Keeton, supra,* at § 54. The Illinois courts have been no exception. Traditionally, they required that plaintiff show some sort of "physical impact" as a circumstantial guarantee that his claimed emotional distress was genuine. *See McAdams v. Eli Lilly & Co.,* 638 F.Supp. 1173, 1174-77 (N.D.Ill.1986). In *Rickey v. Chicago Transit Authority,* 98 Ill.2d 546, 75 Ill.Dec. 211, 457 N.E.2d 1 (1983), the Illinois Supreme Court liberalized the physical impact rule to permit suit by an 8-year-old boy who saw his 5-year-old brother nearly strangled after his clothing became caught in an escalator. The Court substituted the "zone-of-physical-danger-rule," permitting a bystander to recover for negligent infliction of emotional distress if he was "in such proximity to the accident in which the direct victim was physically injured that there was a high risk to him of physical impact." *Id.* 75

Ill.Dec. at 215, 457 N.E.2d at 5. *Accord Siemieniec v. Lutheran General Hospital,* 117 Ill.2d 230, 111 Ill.Dec. 302, 318, 512 N.E.2d 691, 707 (1987) (parents could not recover for emotional distress caused by "wrongful birth" of hemophiliac child in part because they were not in zone of physical danger).

Since *Rickey,* the courts have debated whether the physical impact rule has been discarded in its entirety. In *McAdams,* Judge Duff persuasively reasoned that under the literal holding of *Rickey,* a person directly harmed by negligence—as opposed to a bystander—still must show some kind of physical impact in order to recover. *See* 638 F.Supp. at 1177-78. In *McAdams,* the requirement was satisfied by plaintiff's prenatal exposure to DES. *Id.* at 1178. The Illinois Appellate Court, however, does not appear to have settled upon a consistent approach. For example, in *Corgan v. Muehling,* 167 Ill.App.3d 1093, 118 Ill.Dec. 698, 522 N.E.2d 153 (1st Dist.), *appeal granted,* 122 Ill.2d 572, 125 Ill.Dec. 214, 530 N.E.2d 242 (1988), the court permitted a claim for negligent infliction of emotional distress by a woman who complained that her counselor—who represented himself as a psychologist but in fact was not registered with the state—had committed malpractice by entering into a sexual relationship with her. The court reasoned that as the direct victim of malpractice, the plaintiff need not allege her presence in a zone of physical danger in order recover for negligent infliction of emotional distress. *Id.* 118 Ill.Dec. at 702-704, 522 N.E.2d at 157-59. By contrast, in *Koeller v. Cook County,* 180 Ill.App.3d 425, 129 Ill.Dec. 353, 356-58, 535 N.E.2d 1118, 1121-23 (1st Dist.1989), the court rejected plaintiff's claim that improper disposal of her brother's body had negligently caused her emotional distress, concluding that plaintiff could not plead she had stood in a zone of physical danger. But as the deceased's next of kin, the plaintiff in *Koeller* was not in any sense a bystander, but was in fact one of the persons directly harmed by defendant's negligence. *Courtney v. St. Joseph Hospital,* 149 Ill.App.3d 397, 102 Ill. Dec. 810, 813-14, 500 N.E.2d 703, 706-07

(1st Dist.1986), *appeal denied*, 114 Ill.2d 544, 108 Ill.Dec. 415, 508 N.E.2d 726 (1987). To that extent *Koeller* conflicts with *Corgan.*

The Court need not reconcile these cases in order to conclude that Ross has no claim for negligent infliction of emotional distress. (Nor need it consider the abstruse question of whether a person standing in a zone of physical danger is as much a "direct victim" of negligence as the person physically harmed by negligence. *See Courtney*, 102 Ill.Dec. at 814, 500 N.E.2d at 707.) The furthest the Illinois courts have reached to permit recovery for negligent infliction of emotional distress is the situation presented in *Corgan*, where the victim of a recognized tort of malpractice seeks recovery for emotional distress as part of a claim for damages. But Ross has no action against Creighton for malpractice, and thus does not fall within the rule of *Corgan.* And because he cannot allege that he was physically injured or stood in a zone of physical danger, he does not fall within the rules of *Rickey* and *McAdams.* In other words, Ross's claim contains none of the various circumstantial guarantees of genuineness that the Illinois courts have insisted upon as a precondition to recovery. The Court thus concludes that he has failed to state a claim for negligent infliction of emotional distress.

■ So Ross has neither a claim for educational malpractice nor a claim for negligent infliction of emotional distress. But does he nonetheless have a cause of action that is sui generis? Ross argues that he does, contending that "the present case is so unique and egregious that, despite the lack of precedent, a cause of action should be found to exist." Plaintiff's Response, at 8. Ross basically argues that a special tort be created for the benefit of student athletes, or more precisely, for the benefit of student athletes whose academic performance would not have qualified them to be students had they not been athletes. In Ross's view, "The present case does not question classroom methodology or the competence of instruction. Rather the issue is whether Plaintiff should ever have been admitted to CREIGHTON and whether, once admitted, CREIGHTON had a duty to truly educate Plaintiff and not simply to maintain his eligibility for basketball...." *Id.* at 10.

Ross's inability to plead a cause of action under existing law strongly counsels against creating a new cause of action in his favor. Rules serve little purpose if they are not reasonably predictable and if they do not apply across the board, for one cannot conform behavior to the unknowable. *See* A. Scalia, *The Rule of Law as a Law of Rules*, 56 U.Chi.L.Rev. 1175, 1178–79 (1989). Even a new rule declared through the evolutionary process of the common law ought fairly be deduced from existing doctrine—something that cannot be said for Ross's claim. The policy reasons considered by the Illinois courts further counsel against recognition of this new duty. Schools would be forced to undertake the delphic science of diagnosing the mental condition of potential recruits. And why should the cause of action be limited to student athletes? Shouldn't all students who actually pay tuition also have an equal right to recover if they are negligently admitted, and once negligently admitted, have a right to recover if the school negligently counsels and educates them? [3] To allow Ross to recover might redress a wrong (assuming, for sake of argument, that he was in fact exploited), but it would also endanger the admissions prospects of thousands of marginal students, as schools scrambled to factor into their admissions calculations whether a potentially "negligent admission" now could cost unforeseeable tort damages later. The Court should not and will not craft a new tort for Ross.

### Ross's Contract Claims

Ross's contract claims present a different problem. As an abstract matter, the relationship between university and student is at least in part contractual. *See Carr v. St. John's University*, 17 A.D.2d 632, 231 N.Y.S.2d 410 (1962), *aff'd without*

---

**3.** See Plaintiff's Response, at 8: "[O]nce CREIGHTON recruited ROSS for its basketball team it could not negligently enroll, counsel and educate him."

opinion, *12 N.Y.2d 802, 235 N.Y.S.2d 834, 187 N.E.2d 18 (1962).* As one court has noted, "If ... a private school were simply to accept a student's tuition and thereafter provide no educational services, an action for breach of contract might lie." Paladino v. Adelphi University, *89 A.D.2d 85, 454 N.Y.S.2d 868, 873 (Sup.Ct.1982).* And certainly a scholarship athlete, who provides athletic services in exchange for tuition and expenses, is just as much a party to a contract with his university as the tuition-paying student. Cf. Taylor v. Wake Forest University, *16 N.C.App. 117, 191 S.E.2d 379,* cert. denied, *282 N.C. 307, 192 S.E.2d 197 (1972).*

■ But how far the duties under a contract of education can be enforced in the courts is another matter. New York's courts, for example, have reasoned that the policies forbidding the tort of educational malpractice likewise forbid a breach of contract claim based upon allegedly inferior instruction. *Torres v. Little Flower Children's Service,* 64 N.Y.2d 119, 485 N.Y. S.2d 15, 19, 474 N.E.2d 223, 227 (1984), *cert. denied,* 474 U.S. 864, 106 S.Ct. 181, 88 L.Ed.2d 150 (1985); *Paladino,* 454 N.Y. S.2d at 872–73. This reasoning appears irresistible; otherwise, any educational malpractice claim could be repleaded as a contract claim in order to circumvent the rule against tort recovery. The Court thus concludes that the quality of Creighton's instruction of Ross cannot be attacked on contractual grounds.

■ This does not mean that a school could not be held liable if it breached a specific contractual promise. *See Torres,* 485 N.Y.S.2d at 19, 474 N.E.2d at 227 ("[F]or instance, a designated number of hours of instruction"). Ross argues that Creighton did breach several specific promises by failing to provide "adequate and competent tutoring services," failing "to require plaintiff to attend tutoring sessions," failing "to afford the plaintiff a reasonable opportunity to take full advantage of tutoring services," and refusing to allow plaintiff to "red shirt," that is, to sit out a year of basketball to concentrate on school. Amended Complaint ¶ 28. None of these claims, however, could constitute a breach of contract cognizable at law. Ross does not allege that Creighton failed to provide tutoring, but rather that the tutoring wasn't good enough; as discussed above, claims based upon educational quality cannot be enforced through a lawsuit. For similar reasons, Ross's claim that Creighton did not afford him "reasonable opportunity to take full advantage of tutoring services" cannot support recovery. Ross's claim that Creighton should have forced him to attend tutoring sessions undercuts his claim that he truly desired a "meaningful education" and made the necessary effort, because if this had been the case, Creighton would not have needed to force him to get the tutoring he now says was so badly needed. Anyway, Creighton could not make Ross accept tutoring. And Ross cannot point to a single contractual agreement that entitled him to red-shirt.

■ Ross also claims that Creighton "failed to provide funds ... to complete his college education and obtain a degree." Amended Complaint ¶ 31. But again, he cannot point to a single contractual provision guaranteeing that he would complete college and earn a degree. It also should be underscored that Ross makes no claim that Creighton violated any of its obligations to Westside Prep.

■ Ross appears to argue, however, that this approach is too literal, and that he should not be expected to point to express promises that Creighton did not keep. His reasoning is that his agreement with Creighton was subject to an "implied duty of good faith and fair dealing." Amended Complaint ¶ 25. These implied open-ended duties required Creighton "to provide a reasonable opportunity to the plaintiff to obtain a meaningful college education and degree, including for the defendant to do what was reasonably necessary (including, but not limited to, providing tutoring services, financial assistance as needed and time for the plaintiff to study) to enable the plaintiff to obtain a meaningful college education and degree." Amended Complaint ¶ 26. No limits to these duties are suggested.

**1332**

In short, Ross asks this Court to supply him open-ended terms that were not bargained for or agreed to by Creighton or Ross. Although perhaps within the Court's power (see A. Farnsworth, *Contracts* § 7.17 (1982)), the use of this power undoubtedly is subject to the Court's discretion. In exercising this discretion, the Court must ask whether it should take on the job of supervising the relationship between colleges and student-athletes or creating in effect a new relationship between them. This in turn depends on whether the Court is institutionally situated, much less competent, for the task. Ross's complaint alleges that he was recruited pursuant to the rules of the National Collegiate Athletic Association and the Missouri Valley Conference. On the function of the NCAA, see generally *National Collegiate Athletic Ass'n v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). Absent an express contractual provision giving this Court a basis to act, the Court believes it should leave the supervision of college athletics to private regulatory groups such as the NCAA, which presumably possesses the staff and expertise to carry out the job. The Court will not assume this regulatory role through the guise of enforcing implied contractual terms and duties.

*Conclusion*

For the reasons stated above, the Court denies Creighton's motion under Rule 12(b)(2) to dismiss for lack of personal jurisdiction. The Court grants Creighton's motion under Rule 12(b)(6) to dismiss the case for failure to state a claim upon which relief can be granted. The dismissal is with prejudice. The Court will enter judgment in favor of Creighton and against Ross.