No. 68,353

MARY FINSTAD, *et al.*, *Appellants*, v. WASHBURN UNIVERSITY OF TOPEKA, *Appellee.*

(845 P.2d 685)

Opinion filed January 22, 1993.

*Kenneth M. Carpenter,* of Carpenter, Chartered, of Topeka, argued the cause, and *Richard Showalter,* of the same firm, was with him on the brief for appellants.

*Arthur E. Palmer,* of Goodell, Stratton, Edmonds & Palmer, of Topeka, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an action by court reporting students who are seeking damages against Washburn University of Topeka (Washburn). They alleged a violation of the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.*, in that the school falsely stated in its 1987-89 catalogue that its program in court reporting was accredited or approved by the National Shorthand Reporters Association (NSRA). They further alleged "educational malpractice" in the conduct and supervision of the court reporting program. The district court granted summary judgment in favor of the school, and the students appealed. The appeal was transferred to this court pursuant to K.S.A. 20-3018(c).

The material facts are not in dispute. Washburn initiated its court reporting program in the fall of 1984. In 1985, Debra Smith

became the instructor of the program and was instructor until her resignation in the spring of 1990. Smith was a Certified Shorthand Reporter (CSR) and a Registered Professional Reporter. She had worked as a reporter for a judge and as a freelance reporter for two reporting firms; she also had owned a reporting firm.

Before the fall of 1989, student evaluations of Debra Smith as an instructor ranked her as average to above average. In the fall of 1989, some students complained to the Washburn administration regarding the lack of quality instruction in the court reporting program. Following the complaints, Washburn attempted remedial action.

Washburn's 1985-87 academic catalogue stated: "The School of Applied and Continuing Education's Court and Conference Reporting program began in the Fall Semester of 1984. Washburn University will apply for full accreditation with the National Shorthand Reporters Association (NSRA), which is expected in 1986."

The 1987-89 catalogue stated: "Washburn is accredited or approved by the . . . National Association of Shorthand Reporters." The statement appeared in a section entitled "General Information," which was applicable to the entire university. The catalogue description of the court reporting program does not contain a statement about accreditation.

Also in the 1987-89 catalogue there was a section devoted to the School of Applied and Continuing Education, which offered the court reporting program. Listed in that section were accrediting agencies that had approved other programs in the School of Applied and Continuing Education. There was no statement in that section that the court reporting program was accredited.

On approximately September 25, 1989, Washburn became aware of the claim of accreditation in the catalogue. Beginning on October 1, 1989, white tape was placed over the word on all undistributed catalogues. An announcement was made to classes that there was an error in the catalogue and that accreditation was being sought.

There were several brochures which, at different times during the history of the court reporting program, were made available to students. One version stated: "Washburn University will apply

for full accreditation with the National Shorthand Reporters Association (NSRA), which is expected in 1987. Graduates are eligible to take the examination for certification as a shorthand reporter under the laws of the State of Kansas (C.S.R.)." Other brochures, dated September 1988 and February 1989, stated: "Washburn University's court reporting program has applied for and is seeking full accreditation through the National Shorthand Reporters Association (NSRA)." A brochure, dated July 1990, contained the same statement except "accreditation" had been changed to "approval."

Washburn was notified in the summer of 1990 that its court reporting program had received approval by the NSRA. At no time had the program been denied accreditation or approval.

The 1987-89 academic catalogue stated in large print that Washburn does not guarantee that specific achievement, success, or employment will result from any of its degree programs. It also stated that the catalogue does not create contractual rights.

The percentage of Washburn students who passed the Kansas CSR examination from 1987 through 1991 is lower than the percentage of other students who passed.

The district court regarded the argument made by the students as asking for an "unusually liberal interpretation of the KCPA." For the purpose of their motion for summary judgment, the students had stated that "it should be assumed as fact that no Plaintiff relied upon defendant's representation of approval/accreditation by the National Shorthand Reporters Association of defendant's Court and Conference Reporting Program." Many of the plaintiffs enrolled prior to the publication of the 1987-88 catalogue or enrolled without knowledge of the error in the catalogue. The students claimed that they were aggrieved because they paid tuition for a program that was not accredited, but they do not claim that they were induced to enroll in the program by the false statement that it was accredited. Thus, the students did not demonstrate a causal link between Washburn's false statement and their injuries.

The district court reasoned that it was necessary for the students to show a causal link because the recovery provided under K.S.A. 50-634(b) is for consumers "aggrieved *by a violation of*

*this act.*" (Emphasis added.) The district court, therefore, ruled against the students on this issue.

The basic issue presented by this appeal is whether summary judgment was proper under the facts in this case. Where the facts are not disputed, summary judgment is appropriate. We must view those facts in the light most favorable to the party who defended against the motion for summary judgment, and if reasonable minds could differ as to the conclusion drawn from the facts, summary judgment must be denied. However, if the only questions presented are questions of law, the summary judgment is proper. *McGee v. Chalfant*, 248 Kan. 434, 437, 806 P.2d 980 (1991).

The Kansas Consumer Protection Act was enacted in 1973 to promote the following policy, among others: "to protect consumers from suppliers who commit deceptive and unconscionable practices." K.S.A. 50-623(b). In order to promote this policy, the "KCPA is to be construed liberally. *Willman v. Ewen*, 230 Kan. 262, 267, 634 P.2d 1061 (1981)." *Stair v. Gaylord*, 232 Kan. 765, 775, 659 P.2d 178 (1983).

Private remedies available under the Act include the following: "A consumer who is aggrieved by a violation of this act may recover . . . actual damages or a civil penalty, . . . whichever is greater." K.S.A. 50-634(b). K.S.A. 50-636(a) provides, in pertinent part:

> "The commission of any act or practice declared to be a violation of this act shall render the violator liable to the aggrieved consumer . . . for the payment of a civil penalty . . . in a sum set by the court of not more than $2,000 for each violation."

The penalty was raised from $2,000 to $5,000 after this suit was filed.

K.S.A. 1973 Supp. 50-634(b), as originally passed, provided that "[a] consumer who suffers loss as a result of a violation of this act may recover, but not in a class action, actual damages or a civil penalty as provided in . . . 50-636(a), whichever is greater." In 1976, the legislature amended this provision by striking the phrase "suffers loss as a result of" and replacing it with "is aggrieved by." L. 1976, ch. 236, § 5.

"Consumer" is defined in the KCPA as "an individual who seeks or acquires property or services for personal, family, house-

hold, business or agricultural purposes." K.S.A. 50-624(b). "Aggrieved" is not defined.

On appeal, the students argue that there is no requirement of a causal connection in the language of the Act. They argue that all they need to show for recovery is that they are consumers who are engaged in a consumer transaction with defendant and that defendant committed a deceptive act or practice under the Act. They extract the word "aggrieved" from its context in 50-634(b) and offer dictionary definitions of the isolated term. They ignore the phrase "by a violation of this act," which follows the word "aggrieved" in 50-634(b).

The students make the unsupported assertion that the KCPA is not a codification of the common-law causes of action for fraud or misrepresentation. They want the court to draw the conclusion that liability under the Act does not require a showing of causation. They cite *Bell v. Kent-Brown Chevrolet Co.,* 1 Kan. App. 2d 131, 133, 561 P.2d 907 (1977), for the proposition that liability under the KCPA does not depend on the supplier's having intent or prior knowledge. Washburn's "state of mind" is not an issue in the present case.

The students cite *Manley v. Wichita Business College,* 237 Kan. 427, 439, 701 P.2d 893 (1985) (citing *Watkins v. Roach Cadillac, Inc.,* 7 Kan. App. 2d 8, 15, 637 P.2d 458 [1981], *rev. denied* 230 Kan. 819 [1982]), for the proposition that the "existence of the actual damages is proof of prejudice even though actual damages are not required in consumer protection cases." The students relate the proposition to the present case as follows: "If damages, as such, are not required, then damages resulting from reliance are not required either. If damages resulting from reliance are not required, the reliance itself is not required." The students do not cite *Manley* for the principle that damages prove prejudice, which is what the case stands for. The students quote it for the principle that actual damages need not be shown in consumer protection cases. Under K.S.A. 50-634(b), a civil penalty is available when actual damages are minimal, but the availability of either damages or a penalty depends on the consumer's being "aggrieved by a violation of [the] act." If the students are not aggrieved by the violation, then they do not have a remedy under K.S.A. 50-634(b).

The students also argue that an action brought by the attorney general or a county attorney or district attorney need not be brought for an "aggrieved consumer." The attorney general is charged with investigation and enforcement of the Act. K.S.A. 50-628. K.S.A. 50-631, K.S.A. 50-632, and K.S.A. 50-633 spell out the means for accomplishing these responsibilities. Because a remedy is available to the attorney general is not a basis for concluding that the same is true for a consumer whose private remedies are set out in K.S.A. 50-634.

Finally, the students argue that the KCPA previously contained a causal link requirement, but that it "has been amended out of the Act." This argument is based on the following statement in Note, *A New Kansas Approach to an Old Fraud,* 14 Washburn L.J. 623, 636-37 (1975): "As in tort actions generally, . . . the plaintiff must prove a causal connection between the alleged deception and his damage. He can show this by proving his reliance on the alleged deceptive act." The pertinent portion of footnote 90 to the text quoted above quotes K.S.A. 1974 Supp. 50-634(b) as follows: " 'A consumer who suffers loss *as a result of* a violation of this act may recover . . . actual damages . . . .' (emphasis added)." We do not agree that the change from the 1974 version of this section to the current one eliminates the need to show a causal connection.

We note the amendment in 1991 to the KCPA is not mentioned by either party. K.S.A. 1991 Supp. 50-626(b)(1)(B) provides:

"Deceptive acts and practices include, but are not limited to, the following, each of which is hereby declared to be a violation of this act, *whether or not any consumer has in fact been misled:*

(1) Representations made knowingly or with reason to know that:

. . . .

(B) the supplier has a sponsorship, approval, status, affiliation or connection that the supplier does not have." (Emphasis added.)

The italicized phrase, *whether or not any consumer has in fact been misled,* was added in the 1991 legislative session, effective July 1, 1991. L. 1991, ch. 159, § 2. K.S.A. 50-626(a) provides that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." Thus, a supplier's commission of a deceptive act, as described in 50-626(b), constitutes a violation of the KCPA.

The students' petition was filed approximately a year before this amendment became effective. This court has stated: "Ordinarily, courts presume that, by changing the language of a statute, the legislature intends either to clarify its meaning or to change its effect." *Watkins v. Hartsock*, 245 Kan. 756, 759, 783 P.2d 1293 (1989). It appears from the 1973 Kansas Comment to 50-626 that the 1991 change amounted to clarification. The Comment states, in pertinent part:

"The acts and practices listed in subsection (*b*) are treated as *per se* deceptive, and are merely illustrative of the acts and practices which violate the act as set forth in the broadly worded subsection (*a*). The old Buyer Protection Act contained no list of *per se* deceptive practices, but relied on general language.

. . . .

"Subsection (*b*)(1)(B) would, for example, preclude a seller from holding himself out as an authorized dealer, or having received a favorable rating from an organization like Underwriters' Laboratories, when such was not the case."

Thus, from the time the KCPA initially was enacted, Washburn's false statement that its court reporting program was accredited or approved by the National Association of Shorthand Reporters has been a per se violation of the Act. However, it does not follow that the students can recover, absent a showing that they are "aggrieved by" such violation.

The interpretation of a statute is a question of law, and it is the function of the court to interpret a statute to give it the effect intended by the legislature. *Director of Taxation v. Kansas Krude Oil Reclaiming Co.*, 236 Kan. 450, 455, 691 P.2d 1303 (1984). "The fundamental rule of statutory construction is that the intent of the legislature governs. [Citation omitted.] When construing a statute, a court should give words in common usage their natural and ordinary meaning." *Hill v. Hill*, 13 Kan. App. 2d 107, 108, 763 P.2d 640 (1988). In determining legislative intent, we are not limited to consideration of the language used in the statute, but may look to the purpose to be accomplished and the effect the statute may have under the various constructions suggested. *In re Petition of City of Moran*, 238 Kan. 513, 520, 713 P.2d 451 (1986).

This court has never been called upon to interpret the meaning of "aggrieved" in the context of the KCPA. Black's Law Dictionary

defines aggrieved as "[h]aving suffered loss or injury." Black's Law Dictionary 65 (6th ed. 1990). In *Fairfax Drainage District v. City of Kansas City*, 190 Kan. 308, 374 P.2d 35 (1962), this court was called upon to determine the meaning of aggrieved in the context of G.S. 1949, 12-502a, which authorized an appeal by the owner of land within the city limits " 'who shall be aggrieved by the decision of the board of county commissioners.' '" 190 Kan. at 314. The district court held the drainage district was not an aggrieved party and, therefore, could not appeal from the order of the board of county commissioners. In affirming the district court, this court quoted with approval from the district court's decision:

" 'A party is aggrieved whose legal right is invaded by an act complained of or whose pecuniary interest is directly affected by the order. The term refers to a substantial grievance, a denial of some personal or property right, or the imposition upon a party of some burden or obligation. In this sense it does not refer to persons who may happen to entertain desires on the subject, but only to those who have rights which may be enforced at law and whose pecuniary interest may be affected. (2 Am. Jur. 941, Appeal and Error, Secs. 149-152; Black's Law Dictionary, 3rd ed.)' " 190 Kan. at 314-15.

In the present case, the students did not rely on the false statement, and many, if not all, of the students were unaware of the statement. Many enrolled prior to the publication of the statement in the university catalogue. Nor is there any showing that any of the students suffered injury or loss as a result of the publication of the statement. The students enrolled and paid the tuition. By so doing, they were consumers under the KCPA; however, the Act requires more in that they must also be aggrieved by the violation.

The students are consumers, but are they aggrieved by the publication of the false statement in the Washburn catalogue? If they are not, then they cannot bring this action to recover damages or a civil penalty under 50-634(b). As we previously noted, the attorney general is charged with the investigation and enforcement of the Act. Alleged violations of the Act, such as the one in the present case, can be brought by the attorney general, and a civil penalty assessed under K.S.A. 50-636. Our statement in *Manley*, 237 Kan. at 439, that "actual damages are not required

in consumer protection cases" was too broad. That is demonstrated by our citation of *Watkins v. Roach Cadillac, Inc.*, 7 Kan. App. 2d 8, as authority for that statement. Watkins brought an action under the KCPA, alleging Roach Leasing, Inc., had committed a deceptive consumer sales practice. Watkins leased a Cadillac automobile from Roach and several months later the paint started cracking; he then learned for the first time that the car had been shipped from the factory with an inferior paint job and Roach had repainted the car. Justice Fromme, speaking for a unanimous court, said:

"Appellant [Roach] contends next that the trial court erred in assessing a civil penalty of $2,000.00 under K.S.A. 50-636(a) because plaintiff failed to establish that he suffered damage by reason of the deceptive act charged. K.S.A. 50-634, relating to private remedies, provided:

'(b) A consumer who is aggrieved by a violation of this act may recover, but not in a class action, actual damages or a civil penalty as provided in K.S.A. 50-636(a), and amendments thereto, whichever is greater.'

"In this case there can be little doubt the consumer plaintiff was aggrieved by a violation of the Act. There was evidence the car was in need of a complete paint job costing at least $200.00. The statute authorizes recovery of actual damages or a civil penalty, not to exceed $2,000.00, to be set by the court. The alternative depends on whichever is greater. The $2,000.00 civil penalty was properly imposed in this case." 7 Kan. App. 2d at 15.

A loss or injury resulting from a violation of the Act is not required in an action filed by the attorney general under K.S.A. 50-632 and K.S.A. 50-636; it is, however, required for one filed by a consumer under K.S.A. 50-634(b).

Ordinarily, there is a presumption that by changing the language of a statute, the intent is to change its effect or clarify its meaning. However, as noted in *Citizens State Bank of Grainfield v. Kaiser*, 12 Kan. App. 2d 530, 536, 750 P.2d 422, *rev. denied* 243 Kan. 777 (1988), the intent-to-change presumption "may be strong or weak according to the circumstances, and may be wanting altogether in a particular case." We do not believe the legislature intended to change the private remedy available to a consumer by the 1976 amendment to 50-634(b). We do not interpret an aggrieved consumer to be one who is neither aware of nor damaged by a violation of the Act. If that had been the intention, it could have been simply and clearly stated in the amendment. If the intent was to change the effect of the statute,

as is urged by the students, the legislature would have merely struck the phrase "suffers a loss as a result of" and not substituted "is aggrieved by" in its place. We conclude that the 1976 amendment to 50-634(b) did not alter the private remedy available to a consumer. Thus, the district court did not err in holding that a causal connection is still required to maintain an action under K.S.A. 50-634(b), and the granting of summary judgment was correct.

The district court also rejected the students' claims of breach of contract and negligent supervision. The district court discussed these two theories of recovery under the single heading, "educational malpractice." On appeal, the students do not object to this characterization of their claims, and in their brief state the issue to be whether this court will "recognize a claim of 'educational malpractice' in this case."

The district court relied on *Ross v. Creighton University,* 740 F. Supp. 1319 (N.D. Ill. 1990), in granting summary judgment to Washburn, stating:

"Applying the reasoning in *Ross,* Plaintiffs' claims are clearly not actionable. While Plaintiffs present statistics demonstrating the low pass rates of Washburn students sitting for the Kansas C.S.R. examination, these statistics prove only that the performances of the Washburn students were indeed poor, not why the performances were poor. The low pass rates may be indicative of factors having nothing to do with the instruction of the court reporting course, such as student absenteeism, student apathy, or student incompetence."

In *Ross,* a former student athlete's lawsuit was dismissed for failure to state a claim upon which relief could be granted. The federal court predicted that Illinois state courts would refuse to recognize a cause of action for educational malpractice. In holding that such an action did not exist in Illinois, the court stated:

"Educational malpractice is a tort theory beloved of commentators, but not of courts. While often proposed as a remedy for those who think themselves wronged by educators [citations omitted], educational malpractice has been repeatedly rejected by the American courts [citations omitted].

"The closest any case cited to this Court has come to accepting a cause of action for educational malpractice is *B.M. v. State of Montana,* 200 Mont. 58, 649 P.2d 425 (1982), which nevertheless failed to muster a majority of the state Supreme Court's seven justices in favor of the tort. . . . [R]ather than provide reasons to adopt the tort, *B.M.* illustrates the common law's extreme reluctance to embrace it." 740 F. Supp. at 1327.

The federal court further stated:

"Admittedly, the term 'educational malpractice' has a seductive ring to it; after all, if doctors, lawyers, accountants and other professionals can be held liable for failing to exercise due care, why can't teachers? [Citation omitted]. The answer is that the nature of education radically differs from other professions. Education is an intensely collaborative process, requiring the interaction of student with teacher. A good student can learn from a poor teacher; a poor student can close his mind to a good teacher. Without effort by a student, he cannot be educated. Good teaching method may vary with the needs of the individual student. In other professions, by contrast, client cooperation is far less important; given a modicum of cooperation, a competent professional in other fields can control the results obtained. But in education, the ultimate responsibility for success remains always with the student. Both the process and the result are subjective, and proof or disproof extremely difficult." 740 F. Supp. at 1328.

On the subject of the floodgates, the federal court stated:

"It also must be remembered that education is a service rendered on an immensely greater scale than other professional services. If every failed student could seek tort damages against any teacher, administrator and school he feels may have shortchanged him at some point in his education, the courts could be deluged and schools shut down. [Citations omitted.] . . . This is not to say that the mere worry that litigation will increase justifies a court's refusal to remedy a wrong; it is to say that the real danger of an unrestrained multiplication of lawsuits shows the disutility of the proposed remedy. If poor education (or student laziness) is to be corrected, a common law action for negligence is not a practical means of going about it." 740 F. Supp. at 1329.

The case of *Donohue v. Copiague UFSD*, 47 N.Y.2d 440, 418 N.Y.S.2d 375, 391 N.E.2d 1352 (1979), is a landmark case that is cited by most if not all state courts that have subsequently considered this issue. In *Donohue*, the Court of Appeals of New York, as a matter of public policy, refused to recognize a cause of action seeking monetary damages for educational malpractice, stating:

"To entertain a cause of action for 'educational malpractice' would require the courts not merely to make judgments as to the validity of broad educational policies—a course we have unalteringly eschewed in the past—but, more importantly, to sit in review of the day-to-day implementation of these policies. Recognition in the courts of this cause of action would constitute blatant interference with the responsibility for the administration of the public school system lodged by Constitution and statute in school administrative agencies. [Citation omitted.] Of course, '[t]his is not to say that

there may never be gross violations of defined public policy which the courts would be obliged to recognize and correct.' *(Matter of New York City Schools Bds. Assn. v. Board of Educ.,* 39 N.Y.2d [111], at p.121, *supra).*" 47 N.Y.2d at 444-45.

Justice Wachtler, concurring, stated:

"I agree that complaints of 'educational malpractice' are for school administrative agencies, rather than the courts, to resolve.

"There is, however, another even more fundamental objection to entertaining plaintiff's cause of action alleging educational malpractice. It is a basic principle that the law does not provide a remedy for every injury *(Howard v. Lecher,* 42 N.Y.2d 109, 113). As the majority notes, the decision of whether a new cause of action should be recognized at law is largely a question of policy. Critical to such a determination is whether the cause of action sought to be pleaded would be reasonably manageable within our legal system. The practical problems raised by a cause of action sounding in educational malpractice are so formidable that I would conclude that such a legal theory should not be cognizable in our courts. These problems, clearly articulated at the Appellate Division, include the practical impossibility of proving that the alleged malpractice of the teacher proximately caused the learning deficiency of the plaintiff student. Factors such as the student's attitude, motivation, temperament, past experience and home environment may all play an essential and immeasurable role in learning. Indeed as the majority observes proximate cause might 'be difficult, if not impossible, to prove.' " 47 N.Y.2d at 445-46.

This is an issue of first impression in Kansas. As noted in *Ross,* the overwhelming majority of courts that have considered a cause of action for educational malpractice have rejected it. 740 F. Supp. at 1327. In fact, the students do not cite nor are we aware of any case which has recognized it.

The students do not offer a single valid reason why this court should create a cause of action against schools and/or teachers for negligence in education. They offer gross generalizations in response to the public policy considerations for rejecting educational malpractice as a tort action. They seem to suggest that a flood of litigation can be avoided if the cause of action is restricted to colleges, universities, and vocational schools. They suggest using "reasonably competent instruction" or "commonly accepted instructional practice" as the standard for judging the adequacy of educational methods. They suggest that thorny questions of causation and damages will resolve themselves if the burden for their proof is placed upon the complaining students.

The strong public policy reasons for not recognizing a tort action for educational malpractice are identified in *Ross* and *Donohue* as (1) a lack of a measurable standard of care; (2) inherent uncertainties as to the cause and nature of damages; (3) the potential for a flood of litigation; and (4) the courts' overseeing the day-to-day operation of the schools. We find these reasons to be compelling and the rationales of *Ross* and *Donohue* to be persuasive. We therefore do not recognize a cause of action in tort for educational malpractice and find that the district court did not err in granting the defendant's motion for summary judgment on plaintiffs' claim for educational malpractice.

The judgment of the district court granting summary judgment to Washburn University is affirmed.

McFARLAND, J., not participating.

TERRY L. BULLOCK, district judge, assigned.